[Crim. No. 182. Third Appellate District.—September 17, 1912.]

THE PEOPLE, Respondent, v. WALLACE A. PRESTON, Appellant.

CRIMINAL LAW—RAPE—INTERCOURSE WITH YOUNG GIRL—SUPPORT OF VERDICT—CORROBORATION OF PROSECUTRIX—CIRCUMSTANCES.—Upon a prosecution for rape by sexual intercourse with a young girl twelve years of age, it is held that the verdict is supported by the testimony of the prosecutrix, whose evidence is not required in such case to be corroborated. Yet it is held that there is corroborative evidence of circumstances appearing in the record which tend strongly to indicate that the parties sustained improper relations with each other, and that the whole evidence places the verdict beyond the power of the appellate court to disturb, notwithstanding discrepancies in the evidence, which was matter for the jury to determine.

ID.—OMISSION OF PROSECUTION TO SHOW VAGINA EXAMINED—OBJEC-
TION NOT AVAILABLE UPON APPEAL.—The mere omission of the pros-
ecution to show that the vagina had been examined to prove that
· sexual intercourse had been accomplished by a male is not avail-
able to the defendant upon appeal, who might, upon motion, have
secured such examination in the interest of justice, if he believed
it would show his innocence.

ID.—RELUCTANCE OF PROSECUTRIX AS WITNESS—EXPLANATION A QUES-
TION FOR JURY—INADMISSIBLE EVIDENCE.—The explanation of the
reluctance of the prosecutrix as a witness, as to whether it was
due to her sense of shame and innate modesty, especially to state
in the presence of grown persons the full facts of her criminal
intimacy with the defendant, who was a married person, much her
senior in years, or was due to a sense of the falsity of her testi-
mony, was a question for the jury to determine. The court prop-
erly excluded evidence for the defendant bearing upon the character
and moral environment of the prosecutrix during her whole life, as
having been reared under bad or immoral influences and surround-
ings, to indicate that she had been coached to tell a fabricated story.

APPEAL from a judgment of the Superior Court of Siski-
you County, and from an order denying a new trial. Jas. F.
Lodge, Judge.

The facts are stated in the opinion of the court.

Mark L. Burns, and Taylor & Tebbe, for Appellant.

U. S. Webb, Attorney General, J. Charles Jones, Deputy
Attorney General, and Frank Hooper, District Attorney of
Siskiyou County, for Respondent.

HART, J.—The defendant prosecutes this appeal from the
judgment of conviction rendered against him and from the
order denying him a new trial on an information charging
him with the crime of statutory rape. The crime is alleged to
have been perpetrated in the county of Siskiyou, in the month
of November, 1910.

The principal point urged by the defendant is that the evi-
dence is insufficient to support the verdict. There is, how-
ever, another point, which was particularly pressed at the oral
argument and which involves an attack on the rulings of the
court disallowing certain testimony proposed by the defend-
ant.

The child, Mabel McNames, upon whom the crime of which the defendant was convicted is alleged to have been committed, is the daughter of a Mrs. Stephenson by William Mc-Names, her former husband, and was, when the alleged acts of criminal intimacy between her and the defendant took place, but a little over twelve years of age.

The defendant was of about the age of forty-five years at the times that his illicit relations with Mabel are claimed to have been maintained, and was a married man, having a wife and a young daughter. He was the owner of some land situated in the "Sleepy Creek" section of Siskiyou county, and not far distant from the place of one Cal. McNames, at whose home the Stephensons resided. It appears that the defendant, during the haying season of the year 1910, went to the McNames ranch for the purpose of assisting the Stephensons in harvesting and gathering their hay, with the understanding that, in consideration of and return for the services thus given, Stephenson would later assist him (Preston) in constructing a levee on or near the latter's ranch. It was only a short time after the defendant commenced working for Stephenson when, according to the story told by Mabel, he began paying inordinate attention to the child, and finally succeeded in securing sexual relations with her.

Preston, it appears, while engaged in working for the Stephensons, occupied a sleeping-room in their house. The girl slept in the kitchen. During that time, so Mabel testified, he visited her room every night, after the rest of the family had gone to sleep, and would get into her bed. After he ceased working for the Stephensons, he would often go to their house late at night, remove his shoes and, leaving them outside the door, go to the room of the child and get in her bed, it appearing that the outside doors to the house were always left unlocked. On one occasion, she said, she went with him in a buggy to his house, situated a short distance from where her family resided, and there (his own family then being in Dorris) he had illicit connection with her. The fact that she went to his house on the occasion referred to was corroborated by the child's mother. Mabel declared that the defendant had had such relations with her as much as nineteen different times and perhaps more than that number of times.

Now, the only testimony in the record tending to establish

the guilt of the accused, aside from a couple of circumstances one of which, if coming about under ordinary conditions, might well be viewed as possessing no special significance of an evil nature, and to which we shall later refer, was that given by the prosecutrix herself. The theory of the defense at the trial, and which was presented in the oral argument to this court with much force and unfeigned earnestness, was that the story of the prosecutrix was purely a fabrication, and that it was inspired and concocted by the mother of the child from motives of blackmail. The defense introduced some testimony tending to sustain that theory, and upon such testimony, together with the fact that numerous inconsistent statements by the prosecutrix concerning the alleged commission of the crime were disclosed on her cross-examination, it is vigorously insisted that this court is justified in finding that the charge was not satisfactorily proved or not sufficiently shown to measure up to the required proof in criminal cases.

The entire record of the testimony taken at the trial has been certified to this court under the new method of bringing up records in criminal cases, and it comprehends six volumes, of the requisite form and size, of typewritten matter. This testimony we have carefully examined and scrutinized, and, while greatly impressed at the time with the oral argument of counsel for the defendant, and, although keenly mindful of the proposition, to which counsel addressed himself with singular force, that a story such as was told by the prosecutrix in this case is one that is ordinarily too readily accepted as verity by the general public, and that the members of a jury in such a case are consequently likely to be influenced more or less by the general feeling with which the atmosphere of the community seems thus to be impregnated as to the story, and will therefore require a less degree of proof to satisfy their minds as to the truth of the story than the law prescribes, yet, after reviewing the testimony in the manner suggested, we find ourselves in a position in which we feel unable to declare that the verdict was not justified. At the same time, it must be admitted that the criticisms of the testimony of the prosecutrix are not altogether without merit.

She was a reluctant witness. It was with great difficulty that she was induced to return any sort of answers to questions propounded to her by the district attorney. But, even-

tually, after several hours were consumed, by persistent and, indeed, rather importunate questioning by the district attorney, the court and even one of the attorneys for the accused, in securing a statement from her of what, if anything, the defendant did to her, she replied that he did "nasty things" to her, and, finally, that "he put his thing into mine," and these constituted the only answers involving accusations against the defendant she made to questions in their form not directly leading or suggestive. These answers and the reluctance with which she returned them constitute in part the basis of the claim and the argument by the defense that her story was fabricated and that it was put into her mouth, not by any improper conduct of the defendant toward her, but by her mother, with and from whom, without cause, it originated and emanated. But the child repeatedly gave as an excuse for not replying to the questions by the district attorney that she was ashamed to tell what had occurred, and several times asked how or in what form she should express it, and it was, of course, a matter for the jury to determine whether her apparent unwillingness to testify was due to the fact, if it was a fact, that the testimony thus called for was false or to the fact of her immature age and innate modesty. The latter inference was certainly as reasonable from the manner in which she acted on the stand as any that could be deduced therefrom, and we might even say that it was the most reasonable that could thus be drawn, for the natural repugnance in a female child of her age to acknowledging, before and in the presence of a number of grown persons, criminal intimacy with a man much her senior in years is a matter of common notoriety.

The further contention is advanced, however, that nowhere did the prosecutrix in direct terms testify that the defendant had sexual relations with her; that the words, "he put his thing into mine," do not necessarily mean that she intended to say that the accused inserted his private parts into her private parts, and, therefore, it is argued, they afford no more ground for the inference that he had sexual intercourse with her than as a basis for the inference that he put something of his into another part of her body—as, for instance, into her hand. But the record shows that after she had answered as above indicated the questions put to her, the district

attorney, referring to a particular occasion on which she had
testified that the accused had done "the same thing to her,"
asked her: "Is that the last time he had sexual intercourse
with you?" to which she replied affirmatively. She had pre-
viously declared that she knew the signification of the words,
"sexual intercourse," as well as of the words "organ" and
"private parts." No attempt was made on cross-examination
to show that she did not know the true import of the words,
"sexual intercourse," and it must be assumed that, when
she declared that she did, she knew precisely the true signifi-
cance of her answer to that effect. If, therefore, there be any
force in the argument that the words, "he put his thing into
mine," do not necessarily mean that the prosecutrix thus in-
tended to express the fact that the accused had sexual rela-
tions with her, her answer to the question to the prosecuting
attorney whether a certain occasion was the last time the
defendant had "sexual intercourse" with her was a sufficient
explanation of what she meant by the use of the words, "he
put his thing into mine." The jury were, in other words,
justified, from her whole testimony, in inferring that she
meant to testify, and did in fact testify, that the defendant
had had sexual relations with her. Moreover, the prosecutrix
further testified that, on one occasion upon which he acted
"nasty" with her, certain of her clothes became stained with
blood as the result of his conduct, and that she destroyed the
clothes by burning them so that her mother would not detect
the blood stains. This was an important circumstance which
the jury were authorized to consider, and very likely did con-
sider, in determining whether she meant to testify, when de-
scribing the defendant's act with her, viz., that "he put his
thing into mine," that he had committed the act of fornication
upon her. Obviously, the act of sexual intercourse may be
proved by circumstantial as well as by direct evidence.

But it is claimed that, assuming that her description of the
defendant's conduct toward her was sufficient to indicate that
he had been illicitly intimate with the girl, still her testimony
stands in the record uncorroborated, and it is insisted that,
considering the character of her story, the conviction should
not be sustained on her uncorroborated testimony. This con-
tention is not strictly correct, as an examination of the cir-

cumstances to which reference is above made will, we think, reveal.

It was shown that the defendant, after the date when, according to the girl's testimony, he began having relations with her, purchased at Yreka and delivered to her a dress, a waist, a belt and a pair of corsets. The girl testified that the defendant stated to her that he intended securing a divorce from his wife and then marrying the prosecutrix; that he said to her one day that he intended to buy her a dress and other articles of wearing apparel, and admonished her to tell her mother, on receiving them, that they came as a present from her own father, William McNames. The prosecutrix further testified that, the defendant having suggested that he would procure for her a ready-made dress, she measured herself by means of strings and gave the strings, indicating the length, etc., of the dress to the defendant prior to his departure for Yreka. On his return, she further testified, the defendant delivered to her a package containing the articles mentioned, and remarked to the child, in the presence of her mother, that he had received the package from the postoffice and conjectured that it was a present from her father. The prosecutrix confirmed this by declaring to her mother that her father had sent her the articles. The mother corroborated the girl's testimony on these matters. The defendant's explanation of this circumstance was that the girl's mother had requested him to purchase the articles and that the measurements of the child, by means of strings, for the purpose of obtaining a ready-made dress, were made by the mother and the strings by her delivered to him. Mrs. Stephenson contradicted the defendant's statement in that respect. He, however, further testified, in this connection, that he first went home on returning from Yreka and that he showed the package to his wife and at the same time explained to her how and for whom he came to purchase the articles. But it is a fact of no little importance and significance in this connection that, although the defendant's wife was a witness in his behalf, she was asked no question and gave no testimony concerning the claim by the defendant that he called her attention to the articles or package and explained to her for whom he had purchased them.

The jury had the right, of course, to believe the prosecutrix and her mother with respect to the circumstances under which the articles were purchased and delivered to the former by the defendant. And, if the jury believed that they told the truth relative to that transaction, then they were at liberty to consider it, in connection with the other testimony in the case, as a circumstance disclosing the defendant's attitude toward the prosecutrix and, perhaps, his motive in presenting her with articles which he said had cost him the sum of ten dollars.

Another circumstance of considerable significance is to be found in the note which the prosecutrix testified that the defendant secretly handed to her on a certain evening, in November, 1911, in which he requested her to meet him secretly the following evening. It appears that, on that occasion, the defendant, one Gibson and one Shirley paid a visit to the Stephensons. All the parties present, including Stephenson and his wife and Mabel, were sitting in the front room. Gibson was engaged in playing a violin and the others were listening to the music and talking. The defendant and Mabel were sitting close to each other near a table, standing in the center of the room. While the music and the conversations were in progress, the defendant passed the note to Mabel in such manner as not to attract the attention of other members of the company. After the visitors, including Preston, departed, Mabel went to her room and there immediately proceeded to read the note, when Cal. McNames stepped into the room, and, observing her perusing the writing, declared to her that she had received the note from Preston. This she at first strongly denied, but a few moments later admitted to McNames that Preston had placed the note in her hands that evening. It appears that McNames, from certain actions he had previously observed on the part of Preston toward the girl, had become suspicious that the pair were sustaining improper relations with each other, and the receipt of the note by the girl from Preston confirmed his suspicions. He thereupon concluded to reveal his suspicions to the mother of the girl, and a short time thereafter told the mother of his suspicions and of the receipt of the note by her daughter. Mrs. Stephenson called the daughter to her presence and accused the latter of receiving a note from Preston. The child at first

strenuously denied receiving such a note, but finally admitted
that, on the occasion above referred to, Preston did clandes-
tinely hand her the note. The mother compelled the prose-
cutrix to produce the writing, and it was offered and received
in evidence. It reads as follows: ''May dear: I wanted to
get to see you. I have got something I must tell you. Can
you come out beyond the water closet too morrow night at
10 o'clock. You know how to leave the door so you can get
out still. I will have the buggy down the fence. Don't fail
if you can come let me know. Destroy this quick.'' The
note was written in pencil and bore no signature, but the dis-
trict attorney introduced some testimony, in the nature of
expert proof, tending to show that the writing contained in
the note was in the hand of the defendant. This testimony
was given by two certain bankers of Siskiyou county, one of
whom, upon comparing the writing in the note with a letter
written by him and also with the admitted signature of the
defendant subscribed to other written instruments, declared
it to be his opinion that the writing in the note was that of
the defendant. This testimony was offered for the purpose,
of course, of supporting the statement of the prosecutrix that
the defendant surreptitiously delivered the writing to her on
the occasion of his visit at the home of her parents with
Shirley and Gibson. Her testimony alone would have been
sufficient to justify the admission of the note in evidence, she
having testified that it was given to her by Preston under the
circumstances indicated, but the district attorney very prop-
erly sought to prove, not only that the defendant handed the
note to the girl under the circumstances as shown, but that he
was the author of the writing contained in the note. This
circumstance, as stated, was important because of its tendency
to disclose that a secret liaison between the defendant and the
girl had been maintained, and thus, in view of the great
disparity between the ages of the two and the fact that the
defendant was a married man, furnish the basis for a strong
inference in support of the verity of the girl's story.

We have now reviewed the principal testimony presented
by the people in support of the charge, and we think that it
must be clearly manifest therefrom that the verdict is thus
placed beyond the power of a court of review to disturb. It
is true, as stated, that the brother and the great uncle of the

prosecutrix gave what appears to be very damaging testimony against the theory and claims of the prosecution. They gave testimony which, if believed, or if believable, when considering their manner of giving it, would tend very strongly to show that the charge was trumped up against the accused for purposes of blackmail. The one testified that the mother, when she first heard of the defendant's alleged treatment of her child, threatened to make him pay her a certain sum of money, and the other declared that the mother threatened the child to do her great physical violence if she failed to stick to her story of the defendant's criminal intimacy with her. It was also made to appear that the mother said that she would sit in the courtroom during the progress of the trial and that she would by a nod of her head indicate to the child how she should answer questions put to her by the attorneys. All this testimony, we say, appears to support the theory that blackmail was at the bottom of the prosecution, or that the charge was the result of a fabrication, yet it could all be true and the accusation that the defendant had been illicitly intimate with the girl still be well founded. In any event, however, the jury and the trial court heard all the testimony, and it must be presumed that they weighed it by means of the tests by which the weight of evidence and the credibility of witnesses may, with approximate accuracy, be determined, and it must be assumed that they, for sufficient legal reasons, after considering the testimony of those witnesses, regarded it as possessing no persuasive evidentiary force.

There is no force here in the argument based upon the suggestion that, if the prosecutrix had in reality subjected herself to sexual relations with the defendant, strong corroborative proof thereof could have been developed by an examination of the vagina of the girl by a physician, who could thus have determined and said whether she had ever had criminal intercourse with a male. From this proposition it is argued that, the people having failed to present to the jury the highest and most reliable proof available to them of one of the essential elements of the crime charged, it was not only the duty of the jury, but it is that of this court, to view the accusations of the girl with such a degree of suspicion and doubt as would and will result in entirely overthrowing her testimony. It would have been well, in the interest of justice, for the people

to have furnished the proof referred to and thus have established to the complete satisfaction of all whether the child had been criminally known by someone, but, since the jury were satisfied by the character of the proof presented in support of the charge, we are unable to perceive where the failure of the people to offer better or more convincing proof upon any of the elements of the offense can now be of any avail to the defendant.    Besides, if the defendant had genuine anxiety to bring the result of an examination of the girl by a physician to the attention of the jury, we can perceive no just reason why the court, in the exercise of its inherent power, could not, upon the motion of the accused, have ordered an examination (the party to be examined not being the defendant), and we doubt not that, upon application by the defendant, the court, in the interest of justice, and under the circumstances, would have promptly ordered an examination before or even at the time of the trial.    (*Johnston* v. *Southern Pac. Co.,* 150 Cal. 536, [89 Pac. 348], and cases therein cited; *Clark* v. *Tulare Dredging Co.,* 14 Cal. App. 414, 438, [112 Pac. 564] ; *Wanek* v. *City of Winona,* 78 Minn. 98, [79 Am. St. Rep. 354, 46 L. R. A. 448, 80 N. W. 851].).

There is nothing inherently improbable in the testimony of the prosecutrix.    It is true that she contradicted herself upon numerous matters, which may, however, when compared to the vital parts of her testimony, well be regarded as of minor importance.    But whatever the nature or character of the contradictions or inconsistencies she might have been guilty of in detailing her story, it was after all for the jury to decide whether such contradictions or such inconsistencies were of such significance as to have the effect of impeaching her statement as to the fact of the asserted sexual intercourse.    In such a case as this, the appellate courts are not authorized to substitute their judgment for that of the jury and the trial court as to the weight and effect of the evidence.    In the case of the *People* v. *Moore,* 155 Cal. 237, [100 Pac. 688], the defendant having been convicted of an assault to commit rape alleged to have taken place on the sidewalk of a public street, upon which and near the scene of the alleged assault a number of people were standing and to which reflected the electric lights from the hotel in front of which the assault occurred, it was vigorously contended that the detailed circumstances

under which the assault was alleged to have been committed were too incredible to support the theory that the purpose of the assault was to commit rape upon the person of the female. The supreme court, however, while in effect conceding the circumstances to be seemingly incredible, was not sufficiently impressed with that contention to reverse the cause for that reason. The court said: ''A court of review, having jurisdiction of questions of law alone, cannot disregard findings of fact supported by direct evidence strongly corroborated by disinterested and unimpeached witnesses—and neither can it be said as a legal conclusion that the facts so found are insufficient to warrant the inference as to the felonious intent.'' There is no rule requiring the prosecutrix in a prosecution for rape to be corroborated, but, as we have shown, the prosecutrix in the case at bar was to some extent corroborated by unimpeached circumstances of more or less potency in probative force, and, as in the Moore case, neither can it be said here, as a matter of law, that, from the entire testimony, the jury were not justified in finding that the crime as charged in the information was satisfactorily proved.

The defendant complains that the court committed prejudicial error by refusing to allow testimony bearing upon the character and the moral environment of the prosecutrix during her whole life. The testimony directed to the proof of these facts was not, as obviously it could not be in the case of statutory rape, offered as a defense to the crime charged against the defendant, but upon the theory that, if it could have been shown that the prosecutrix was reared under bad or immoral influences and surroundings, such testimony would have tended to disclose that the reluctancy with which she gave her testimony was not occasioned by modesty or delicacy or shame regarding the sexual relation, but by the fact that she had been coached by someone to tell a fabricated story.

We think that the court's rulings upon the proffered evidence were correct. No issue of the sort to which the rejected testimony was proposed to be addressed arose in the case, so far as the evidence was concerned, except the manner itself in which the prosecutrix conducted herself as a witness. And it seems to us that, had the proof been allowed, it would not have had any stronger tendency than did the girl's manner of testifying to a discovery of the specific motive or reason actuating.

her to hesitate in describing the revolting details of the alleged conduct of the defendant with her, for it would still remain a question, and one which the jury would be required to decide, whether the cause of the witness' manner of testifying arose out of shame or modesty, or from the falsity of her story, or from a desire to shield the defendant as far as she could under the circumstances, or from any other reason or motive. Nor do we think that it can be justly laid down as an abstract truth that, because a female may have a bad character, she is necessarily to be expected to act or speak immodestly on all occasions. Indeed, it is not uncommon to find females notoriously devoid of strictness in matters of morality who are on most occasions quite circumspect in expressing themselves, and who would, equally with persons of the most exemplary moral conceptions and character, with reluctance narrate in a public courtroom the details of immoral relations they may have sustained with the opposite sex. But, without speculating further as to the effect of such testimony, it may be observed that the manner in which a witness testifies is generally a matter for argument to be addressed to those who must decide the facts. Each side is at liberty to present to the court and jury its own interpretation of the way in which the witness has told his story, and at last it is for the jury to draw their own conclusions as to the significance, in the one direction or the other, of the witness' manner or the influence it should be allowed to exercise in confirming the truth or falsity of his testimony.

We have discovered no just legal reason for remanding the cause, and the judgment and order are, therefore, affirmed.

Chipman, P. J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on November 15, 1912.