[Crim. No. 368.   Third Appellate District.—April 4, 1917.]

## THE PEOPLE, Respondent, v. MADISON SLAUGHTER, Appellant.

CRIMINAL LAW—RAPE—INDICTMENT—ACCOMPLISHMENT OF ACT—DEFECTIVE AVERMENT—LACK OF PREJUDICE.—An indictment charging the crime of rape which uses the word "accomplish," instead of "accomplished," or "did accomplish," in describing the act charged, while grammatically defective, is not prejudicial to the defendant.

ID.—JURY—SUMMONING OF SPECIAL VENIRE—LACK OF PREJUDICE.—In such a prosecution the defendant was not prejudiced by the summoning of a special venire of jurors before the regular panel was exhausted, where all jurors on the latter panel were examined before any name was drawn from the special venire.

ID.—DISALLOWANCE OF CHALLENGE—PEREMPTORY CHALLENGES NOT EXHAUSTED—LACK OF PREJUDICE.—Where a defendant has not exhausted his peremptory challenges he is not prejudiced by the disallowance of a challenge for cause, even if the disallowance is erroneous.

ID.—IMPEACHMENT OF PROSECUTRIX—RIGHT TO EXPLAIN LETTERS AND AFFIDAVIT.—In a prosecution for rape the prosecutrix may explain how she happened to make an affidavit and to write letters denying the accusations which she made against the defendant in her direct examination, which were offered in evidence on her cross-examination for impeachment purposes.

ID.—COMMISSION OF SIMILAR ACTS—PROOF OUT OF ORDER—LACK OF PREJUDICE.—Where in such a prosecution the particular act relied upon for a conviction was stated at the beginning of the trial, it is not error to permit the introduction in evidence out of order of the commission of similar acts.

ID.—COMMISSION OF SEPARATE OFFENSES ON SAME DAY—INSTRUCTION. Where in such a prosecution there was evidence of the commission of two offenses on the same day, an instruction authorizing a conviction if the jury believed the offense occurred at any time on such day is not erroneous, where by another instruction such general language was limited to the particular offense upon which a conviction was asked.

Id.—Probability of Commission of Act—Similar Acts—Instruction.—An instruction that the jury might consider previous acts similar to the one charged in the indictment as tending to show the disposition of the defendant toward the prosecutrix, and for the purpose of ascertaining whether it was probable that the act charged was committed, is not erroneous as authorizing a conviction upon a probability of guilt.

Id.—Proof of Fact—Testimony of Single Witness—Instruction. An instruction that the testimony of one witness is sufficient to establish any fact necessary to be proved if believed by the jury beyond a reasonable doubt, is not erroneous, although awkwardly expressed.

Id.—Request for Reading of Testimony—Verdict Without Waiting for—Lack of Prejudice.—The defendant in a criminal action is not deprived of any substantial right to which he is entitled under section 1138 of the Code of Civil Procedure, where the jury after several hours' deliberation requested that a certain portion of the testimony be read to them, and upon being informed that it would take some time to locate it, expressed an opinion that they might reach a verdict without it, which they did.

Id.—Rape—Evidence—Uncorroborated Testimony of Prosecutrix.—In a prosecution for rape the uncorroborated testimony of the prosecutrix is sufficient to warrant a conviction.

APPEAL from a judgment of the Superior Court of Butte County, and from an order denying a new trial. H. D. Gregory, Judge.

The facts are stated in the opinion of the court.

W. H. Schooler, and Madison Slaughter, *in pro. per.*, for Appellant.

U. S. Webb, Attorney-General, and J. Chas. Jones, Deputy Attorney-General, for Respondent.

BURNETT, J.—We are not unmindful of the grave importance of the questions involved in the determination of this appeal. We are appreciative of the significance of the various circumstances connected with the charge and the trial to which our attention has been earnestly invited. We have given serious attention especially to the reiterated and emphatic declaration that appellant did not receive that fair and impartial trial which is the unquestionable right of every American citizen, and we have considered as carefully as pos-

sible the various specified particular grounds for that contention. It is undoubtedly true that a charge of this kind is likely to make such an impression on the minds of many people in the vicinity as to unfit them for that calm, impartial, and deliberate action which the law demands of every juror. The mere accusation when given wings, as usually happens in such cases, excites the prejudice, arouses the resentment, and disturbs and impairs the judgment of a part of the community, and there is danger, of course, that the unfair and hostile attitude toward the defendant thereby engendered may reach the jury-box and even the judge upon the bench. The fact that the one accused is a minister of the Gospel intensifies the situation and increases the probability of unfavorable and malevolent impressions and sentiments. Even upright and righteous persons, with a due conception of the importance and sanctity of this high calling, are sometimes too easily moved to give credence to a story impugning the chastity of one filling the holy office of the ministry and, therefore, also too ready to contribute to the creation of an unfavorable environment for the dispassionate determination of the guilt or innocence of the accused. It is more emphatically true that in every community there are some small souls who, by reason of their sinister and malignant opposition to the cause of religion, and through a depraved desire to cripple the efficiency of religious efforts and to destroy confidence in its advocates and promoters, with avid glee welcome every imputation, especially of the kind involved herein, against the character and standing of a minister of the Gospel. These people generally, also, hasten to prejudge the case, and with feverish anxiety seek to inoculate as many as possible of the community with the virus of their own prejudice and hatred. These and other unfavorable considerations were, no doubt, at work in the community wherein the defendant was tried and convicted, and probably quite a number of the citizens had irrevocably determined his guilt before a witness was heard in court.

However, we feel satisfied that the vast majority of the people of Butte County, moved by the spirit of fair play and a desire that there be no unwarranted interference with the orderly processes of the law, were in that mental and moral frame of mind essential to the impartial administration of justice as between the plaintiff and defendant.

But, what is more to the point, we are convinced from an examination of the record that there was no such prejudice or hostility on the part of the trial judge, or of any of the jurors, nor was there any misconduct on the part of either, nor any such acts or omissions during the course of the trial as would legally justify this court in setting aside the verdict. We go further, and say that in none of the contentions of appellant do we find sufficient merit to warrant any interference with the judgment of the lower court, as will more fully appear while we proceed to notice the specific points which are urged upon our attention with great ability and impressiveness in the four different briefs filed in his behalf, three of which, bearing his own signature, were undoubtedly prepared by a former astute member of the bar now sojourning at San Quentin.

The indictment is grammatically defective in using the word "accomplish," instead of "accomplished," or "did accomplish," but while the district attorney thus manifested a degree of carelessness it is perfectly apparent that the defendant suffered no prejudice by reason of the defective averment. The charging part of said instrument is as follows: "The said Madison Slaughter on or about the 7th day of November A. D. nineteen hundred and fifteen at the county of Butte and state of California, and before the finding of this indictment wrongfully, unlawfully, willfully and feloniously accomplish an act of sexual intercourse with one Gertrude Lamson, . . . a female under the age of eighteen years, to wit, the age of fifteen years," etc. If any one at all familiar with the English language could not understand that the intention was to charge that the said Madison Slaughter "did accomplish" the act on said date his sanity would be the proper subject for investigation. And yet, with great earnestness and apparent sincerity, it is argued that the cause should be reversed for this verbal inaccuracy. We are spared any further comment, however, for the reason that the identical point was decided in the case of *People* v. *Haagen,* 139 Cal. 115, [72 Pac. 836], wherein it was said: "We do not think there is any merit in this contention."

The jurors drawn on the regular venire were insufficient to complete the jury and a special venire was issued. This is made the subject of criticism and complaint by appellant, but the practice is authorized by the code and sanctioned by the

decisions of the courts. (Code Civ. Proc., secs. 226, 227; *People* v. *Sehorn,* 116 Cal. 503, 508, [48 Pac. 495] ; *People* v. *Suesser,* 142 Cal. 354, 359, [75 Pac. 1093].) In the Sehorn case it was said: "There may, no doubt, be cases where, as was said in *Levy* v. *Wilson,* 69 Cal. 105, 111, [10 Pac. 272], the drawing of the entire jury from the box would be 'more consistent with the correct administration of justice,' but it has frequently been held, with respect to both grand and trial jurors, that after the venire drawn from the regular jurors had been exhausted the court may order additional jurors to be summoned from the county at large, and that such proceeding is valid—at least, unless there has been a gross abuse of discretion." There is nothing in the case here to show that the discretion thus vested in the trial court was not properly exercised. No doubt the special venire was ordered to save time and expense, and we are not authorized to conclude that appellant suffered any prejudice thereby. The fact that the order was made before all the jurors on the preceding venire had been examined is of no moment, since such examination was completed before any name was drawn from the special venire. The procedure was at most an irregularity which worked no damage.

Complaint is made that the court improperly overruled defendant's challenge to certain jurors for bias. Of the twelve selected it is not pretended that such objection could be made to more than two. These are John Finning and T. R. Boalt. As to the others there can be no possible controversy. The court might well have excused Mr. Finning, although he declared that he could and would disregard his opinion, and be controlled entirely by the evidence and the instructions. However, his was a doubtful case, and there should be no hesitation in resolving such doubt in favor of the defendant. But for the reason that he accepted the juror while still having five peremptory challenges, appellant is in no position to complain of the ruling. The point is covered and controlled by the cases of *People* v. *Durrant,* 116 Cal. 179, 196, [48 Pac. 75] , *People* v. *Schafer,* 161 Cal. 573, 576, [119 Pac. 920] , *Scragg* v. *Sallee,* 24 Cal. App. 133, 139, [140 Pac. 706] , and *People* v. *Perry,* 25 Cal. App. 337, 338, [143 Pac. 798]. Therein this and the supreme court approved the doctrine stated in Thompson on Trials, section 120, as follows: "It is a rule of paramount importance that errors committed in

33 Cal. App.—24

overruling challenges for cause are not grounds of reversal, unless it be *shown an objectionable juror was forced* upon the challenging party *after* he had exhausted his peremptory challenges; if his peremptory challenges remain unexhausted, so that he might have excluded the objectionable juror by that means he has no grounds of complaint.'' It is true that his peremptory challenges were finally exhausted. but not until he had accepted Mr. Finning and he was sworn to try the case. In *People* v. *Riggins,* 159 Cal. 113, [112 Pac. 862], relied upon by appellant, it appears ''not only that the defendant exhausted all his peremptory challenges, but that by reason of the rulings of the court he was forced to accept McKeen, a juror objectionable to him and challenged by him for cause and also that he asked the privilege of challenging McKeen peremptorily and that his request was denied.'' The rule is one not only of expediency but of justice. The peremptory challenge affords an auxiliary or additional method for getting rid of an objectionable juror. If the defendant feels that a juror is disqualified he may challenge him for cause, but the court may not concur in that view. If so, and the limit of peremptory challenges has not been reached, the defendant must avail himself of that remedy or else be deemed to have waived his objection. When the peremptory challenges have been exhausted the situation, of course, is quite different, as he then has only the one remedy, and in case of an adverse ruling he may have it reviewed by the appellate court. Such is the instance of juror Boalt. On his direct examination he testified that he had an opinion in regard to the case and, asked as to how it was formed, he answered: ''By newspaper talk and talking on the streets,'' and, in reply to the question: ''In what other manner if any was this opinion formed?'' he said: ''I have heard a few words that took place here, I heard of some parties who talked with parties that were here who quoted me about ten words.'' If it be argued that he meant by these answers that his opinion was influenced by the ten words that had been repeated in his presence, we cannot assume that they were prejudicial to appellant, since it does not appear what they were. Besides, in the further course of the examination, he stated that his opinion was founded entirely upon newspaper reports and street gossip, and still further that his opinion was based only upon ''what little I read in the paper.'' It was, therefore, for the trial

court to determine what was the source of his opinion, and the decision is binding upon this court. Indeed, the examination of the juror presents an instance for the application of the rule laid down in *People* v. *Ryan*, 152 Cal. 364, 371, [92 Pac. 853], and *People* v. *Edwards*, 163 Cal. 752, [127 Pac. 58], and other decisions. In the former it is said: "The trial court must decide which of the answers most truly shows the juror's mind." Indeed, so far as we can judge from the cold record, Mr. Boalt was unbiased and entirely disposed to be fair and just. He declared several times that he would lay aside any opinion that he might have and be guided entirely by the evidence and the instructions of the court, and that he would act fairly and impartially in the case. As we read the record we are satisfied there is no just ground for complaint as to the selection and impanelment of the jury.

Among the many questions presented as to the admissibility of evidence, we notice first the ruling of the court in relation to the explanation by the prosecutrix of an affidavit and two letters made and written by her. These instruments were secured by the defendant and offered in evidence on her cross-examination.

The first letter was addressed to Mr. Kennedy, one of the counsel for appellant, was dated February 19, 1916, and was as follows:

"I am writing this of my own free will, and under no one's influence. I have done a very great wrong which I am very sorry for and want to correct. I have told an outrageous lie. I don't know whether anyone will speak to me or not; I hope they will. That what I have charged against Mr. Slaughter is an absolute lie, which I want seen to and done away with soon as possible. And I will say with the oath of God I will never tell another lie to anyone of any kind again as long as I lives. I was very angry when I told this lie and the second one I told it to encouraged me so much I kept it up. Now I deny it and deny it forever. Remember no one has influenced me in any way only to tell the truth. Unless it was the partys that got me in this mess."

The other letter was directed to "Mr. and Mrs. Slaughter and Girls" and was of similar tenor. It concluded with the declaration: "I am sorry to the bottom of my heart and soul and experience has been a very dear teacher to me and I mean to begin over again and live a new good right life."

. The affidavit is clearly in the language of an expert, and not such as would have been chosen by the prosecutrix. Therein, among others, were the statements that said letters contained the truth, that she was not influenced by Mr. Kennedy to write the same but did so of her own free will; that said statement was made to right a great wrong; that she never had sexual intercourse with defendant at any time or place and that he had always acted toward her "in a proper, gentlemanly and straight-forward way"; that the affidavit was made to rectify a great wrong, and while made at the request of Guy R. Kennedy it "has been read to me and the entire contents of the same is the truth, the whole truth and nothing but the truth." The witness also testified on said cross-examination as to declarations she had made to Mr. Schooler, one of the attorneys for appellant, denying any improper relations with Mr. Slaughter. Over strenuous objections the witness was permitted to explain these various statements, and to detail the circumstances under which they were made. The purpose was, of course, to show the undue influence that was exerted in behalf of appellant, and to minimize or nullify the effect upon her credibility of her different contradictions. It was the theory of the plaintiff that a conspiracy existed in which the mother, father, and defendant with his attorneys participated, designed to coerce the witness into a renunciation of her charges and an abandonment of the prosecution. On redirect examination the people, therefore, in support of the contention, were permitted to show that she was told her mother's health was bad and that she would cause her death if she persisted in the prosecution; that defendant himself brought her father, Frederick Lamson, to his daughter, and the father said: "There, see what you have done, you will kill your mother"; that one of the defendant's attorneys came in the night-time to her home to use his influence upon her; that her mother told her the defendant should not be prosecuted; that statements were made by defendant's attorneys calculated to induce the belief that she would get into trouble if she insisted upon the charge against Mr. Slaughter, and some other circumstances of similar tenor were related by the witness. To illustrate this line of examination we may set out her statement of what her father said to her: "He had told me that he believed my story and that he had believed it all along, but for me not to say anything or not

to tell mamma that he did, or to tell anybody and during the time mamma was having these spells he said: 'Whatever she said to answer yes and never to dispute her in anything,' and he said that I would probably be the cause of her death anyway.'' We think there was no violation therein of the familiar rule permitting a witness to explain contradictory statements. It would be strange if her mouth were closed as to the circumstances and inducements of the transaction called out on cross-examination for the purpose of impeaching her veracity and destroying her credibility. Some portions of said testimony may have been objectionable, but there was no motion to strike them out, and the questions themselves were entirely proper. Of course, the only purpose of such examination is as we have indicated, and her recital of certain statements made to her was not to be considered as evidence of the truth of said declarations. If this was not made entirely clear to the jury it was the fault of appellant in not requesting a specific direction to that effect.

In *People* v. *Smallman*, 55 Cal. 185, on the cross-examination of the prosecuting witness, defendants, for the purpose of affecting her credibility, offered an affidavit made and signed by her but written by one Carey who presented and read it to the witness. On the direct examination the witness was asked as to the circumstances under which the affidavit was made, and what conversation she had with Carey about it. The defendants objected to any conversation of witness with Carey in relation to this affidavit which was had in the absence of the defendant. The court overruled the objection and admitted the evidence. The supreme court said: ''We see no error in this ruling. It was proper to ask the witness as to every matter which occurred in relation to and in connection with the affidavit.''

In *People* v. *Wessel*, 98 Cal. 352, [33 Pac. 216], the court said: ''To contradict the testimony of the prosecutrix, who was a child of eleven years, the defense read the testimony before the committing magistrate, in which it was claimed she had made statements inconsistent with her evidence on the trial. Thereupon the prosecution recalled the prosecutrix and asked her to explain the discrepancies. This course was too plainly proper and of too common practice to justify the presentation of the question here.''

In *Bradford* v. *Woodworth,* 108 Cal. 684, [41 Pac. 797], it was said: "It was proper to permit plaintiff to explain in rebuttal the telegram which had been introduced by the defendant to contradict his testimony." (See, also, *People* v. *Glover,* 141 Cal. 233, [74 Pac. 745] ; *Risdon* v. *Yates,* 145 Cal. 210, 212, [78 Pac. 641] ; *Hoggan* v. *Cahoon,* 31 Utah, 172, [87 Pac. 164] ; *Strebin* v. *Lavengood,* 163 Ind. 478, [71 N. E. 494].)

The prosecution adopted a circuitous method of obtaining the explanation, and asked of the witness many unnecessary questions, but circumlocution or volubility is not necessarily error. The witness was not lacking in intelligence or assurance, and a simple question as to why she made such contradictory statements would probably have produced the explanation and avoided the necessity for such protracted and wearisome examination. However, the defendant opened the door for an investigation of the reasons that moved and influenced the witness to make such contradictory statements and we find therein no prejudicial error. The cases cited as to this point by appellant do not sustain his contention.

In *Wagner* v. *People,* 30 Mich. 384, the evidence brought out on the cross-examination was incompetent, although admitted without objection, and it was correctly held that this hearsay evidence was not subject to modification or explanation on the redirect examination.

The later Michigan case, *People* v. *Hanifan,* 98 Mich. 32, [56 N. W. 1048], supports respondent's position here. Therein it was held that "where, on the trial of a respondent for larceny, his counsel show on the cross-examination of one of the people's witnesses, that the witness had some trouble with the respondent subsequent to the alleged larceny and that he would like to get even with respondent, it is proper to permit the witness, on his redirect examination, to explain the nature of the trouble."

In *Atherton* v. *Defreeze,* 129 Mich. 364, [88 N. W. 886], where the relevant part of a conversation was received it was held that on cross-examination it was not proper to introduce another part of the conversation which had no connection with the issue involved, and had no bearing whatever upon the part that was relevant.

The case of *Garey* v. *Nicholson,* 24 Wend. (N. Y.) 350, is of similar import. Referring to the rule that where a part

of a conversation is introduced in evidence by one party the other has a right to call for the whole conversation, the supreme court of New York said: "That, however, must obviously mean that the additional conversation called for should be relevant to the matter in issue. All evidence is received under that qualification; and if not so restrained, might operate as a waste of time. Other subjects might be introduced having no connection with the subject matter of the suit."

*Commonwealth* v. *Keyes,* 11 Gray (Mass.), 323, is to the same effect. In reference to the complaint of the defendant that she was debarred from proving the residue of a conversation of which a part had been produced by the prosecution against her, it was declared by the supreme court of Massachusetts: "The proof in such case is to be confined to what was said upon or concerning those matters which are made subjects of inquiry or investigation. Every remark or observation made upon those topics is to be received as competent evidence because they may essentially modify the character and purport of the whole conversation and vitally affect what might otherwise appear to be explicitly asserted or denied. (1 Greenl. Ev., secs. 201–218.)"

A great many other rulings of the court as to the admissibility of evidence are severely criticised by appellant. We do not feel called upon to notice them specifically, although they have been carefully examined. Some of them, it may be said, are of doubtful propriety, but it could hardly be otherwise, considering the mass of testimony and the multitude of objections. However, as before stated, we find in none of the rulings any warrant for a reversal of the judgment. Each side was very swift to object to questions propounded by the other, and thereby the time of the trial was greatly extended and the labor of the trial judge was largely increased. In the heat of the contest, also, counsel indulged in frequent interruptions and in occasional acrimonious suggestions which no doubt tried the patience of the court, but we believe the trial was conducted with due regard for the proprieties of juridical procedure.

That other acts of a similar nature were permitted to be shown out of order was not error, in view of the fact that at the beginning of the trial the district attorney made and stated the election of the prosecution as to the particular

offense for which a conviction was asked. (*People* v. *Koller,* 142 Cal. 621, 624, [76 Pac. 500].)

Earnest objection is made to this instruction given by the court: "The indictment in this case charging defendant with the offense for which he is now on trial was filed January 31, 1916. In that indictment it is alleged that the offense was committed by defendant on or about the seventh day of November, 1915, and before the finding of the indictment. It is not necessary to prove the commission of the offense now on trial at the precise time or date alleged in the indictment, but it is sufficient to prove its commission at any time on November 14, 1915, if the evidence proves beyond a reasonable doubt that defendant on said last-mentioned date has been guilty of the offense of rape charged in the indictment." It is not claimed that the people are confined to the precise date contained in the indictment, and it is admitted that ordinarily the instruction would be unobjectionable, but it is insisted that by reason of the fact that there was evidence of two separate offenses on said date of November 14th, the instruction authorized a conviction if a part of the jury believed that one and the remaining jurors believed that the other was established, although there was no concurrence of the twelve as to either of said declared offenses. There would be much force in this criticism were it not for the fact that this instruction was qualified by another reading as follows: "I will instruct you now that wherever in these instructions I have referred to the act as charged of November 14, 1915, I referred to the act charged as having been committed on a chair in the dining-room as charged in the evidence as the only act upon which he is now on trial." This was not inconsistent with the former, but a definite limitation of the more general language, and it removed any probability of the result apprehended by appellant. (*People* v. *Besold,* 154 Cal. 363, 370, [97 Pac. 871].)

In instruction No. 42 the jury was directed that they might consider previous acts similar to the one charged in the indictment as tending to show the disposition of the defendant toward the prosecutrix, and "for the purpose of ascertaining whether it is or is not more probable that the act of sexual intercourse charged to have been committed on November 14, 1915, was committed, and for no other purpose." There is no merit in the contention that thereby the jurors were in-

structed that they might convict upon a probability of guilt. It signified no more than an instruction that they might consider such evidence as bearing upon the question of appellant's guilt or innocence of the charge made in the indictment. If they were to consider it at all it is difficult to understand how it could be regarded except as relating to the probability of guilt. As to the rule requiring the jury to be convinced beyond a reasonable doubt of the defendant's guilt in order to convict they were fully and repeatedly instructed. It may be · said that a similar instruction to the one before us was approved in *People* v. *Mathews,* 139 Cal. 527, 530, [73 Pac. 416].)

Instruction No. 40 was to the effect that in such prosecution the testimony of one witness is sufficient to establish any fact necessary to be proved if believed by the jury beyond a reasonable doubt. There can be no fault found with the principle therein declared, although it is somewhat awkwardly expressed. The jury, though, could not have been misled by it.

The defendant requested an instruction as to the presumption of innocence. Therein was an expression that "this presumption is an instrument of proof," and it is contended that this specific affirmation ought to have been brought to the attention of the jury. It is perfectly clear, however, that the consideration which should be accorded to this presumption was fully set forth in several instructions given by the court. That it was not designated as an "instrument of proof," or "evidence," is a mere verbal criticism without merit. (*People* v. *Linares,* 142 Cal. 17, [75 Pac. 308]; *Agnew* v. *United States,* 165 U. S. 630, [41 L. Ed. 624, 17 Sup. Ct. Rep. 235].) The fact is that the rejected instruction would have added nothing to the following which was given: "The jury is instructed that the defendant comes before you clothed with the presumption of innocence and that such presumption is not a mere form to be disregarded by the jury at its pleasure, but it is a substantial part of the law of the land, and binding on the jury in this case, as in all criminal cases, and it is the duty of the jury to give the defendant in this case the full benefit of this presumption, and to acquit him, unless the evidence in this case convinces you of his guilt as charged, beyond all reasonable doubt; and you are compelled under your oaths to carry this presumption in your minds during

every stage of the trial, and give the defendant the benefit of it until such time as you may be convinced beyond all reasonable doubt of his guilt, as charged in the specific offense elected by the prosecution, that of November 14, 1915.'' The foregoing was given at the request of appellant and leaves nothing to be desired on the subject. Indeed, the jury were fully and correctly instructed on every material phase of the case, and no just criticism can be made of the court in reference to the instructions given or refused.

After the submission of the cause and the jury had deliberated for several hours they returned and, through their foreman, made a request to have a portion of the testimony read. The proceedings in relation to it are shown by the record as follows:

''Foreman Darrell: If the court please, we wish to apologize to your Honor and the attorneys and the court officials and others present for causing you to convene court at this time, but there are certain points in the evidence upon which we do not agree and we deem it necessary that the evidence be read. The clerk has the memoranda for the evidence we desire.

''The Court: Yes, I see. Mr. McCallum, you have seen that memoranda, have you—show it to Mr. Schooler.''

At this time Mr. Schooler examines note containing request for testimony.

''The Court [to the reporter]: How long would it take you, Mr. McCallum, to prepare yourself to read that to this jury?''

The testimony requested by the jury to be read included the testimony of Gertrude Lamson, cross and direct, and that of Thomas Whidden and Mrs. Whidden. At this time the reporter stated that in order to go over the entire direct and cross-examination of Gertrude Lamson, of Thomas Whidden, and of Mrs. Whidden, which testimony extended continuously over a period of approximately four days, that he might be able to locate the particular testimony desired in an hour, but in order to look over all the testimony mentioned by the jury and to locate it in its entirety with the required certainty necessary, it would take perhaps several hours, and that to read the entire testimony mentioned, thus entirely avoiding the danger of omitting any portion of that men-

tioned by the jury, that it would require at least three days' time.

"Foreman Darrell: If the court please, it is just a slight portion of the evidence of the witness referred to in the memoranda we desire.

"The Court: I see, but we have to give the reporter some time to look it up. I will have to give him some time to report to me that he has found it. You see that big stack of books before him there, gentlemen; they contain the evidence that he has to seek through and get the line and the sentences that you want in order to cover your request fully.

"Foreman Darrell: Providing we determine to get along without this testimony, if after debating the matter further we can proceed without this particular evidence then what?

"The Court: It is for you gentlemen of the jury, when you get ready to report a verdict—if you find a verdict to notify the officers and they will notify the rest of us.

"Foreman Darrell: My point was this, that I do not believe that those who desire the reading of this portion of the testimony—in fact I am sure that they were not aware that it would take any considerable time to produce that. There was simply a question that arose upon which we could not agree. As stated in the memoranda, we were under the impression that it required only a few moments, as it was a very small part of the evidence that was given by those three parties that we wanted.

"The Court: I do not know of anything to do only to let you go to your jury-room and let the reporter go to work and find the testimony that you want and when he finds it we will report to you. You can now return to your jury-room. [In accordance with the foregoing proceedings, after the jury retired again to their jury-room to deliberate further, the reporter proceeded to locate through the testimony of the foregoing named three witnesses, covering some one thousand or one thousand two hundred pages of shorthand, the portions thereof covered by the memoranda submitted to the court by the jury and awaited a further call from the jury.] At this time, to wit, 9:10 o'clock A. M. on this thirteenth day of May, 1916, after having been out all night, the jury returned into the courtroom and the following proceedings are had".: Then follows the announcement of the verdict

in the usual manner without any further reference to said testimony.

Section 1138 of the Penal Code provides: ''After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the cause, they must require the officer to conduct them into court.  Upon being brought into court, the information required must be given in the presence of, or after notice to, the district attorney, and the defendant or·his counsel, or after they have been called.''

It is the claim of appellant that to his prejudice he was deprived of the substantial right to which he was entitled by this statute, and therefore his conviction should be reversed. His contention is not supported by the record.  The statute must, of course, have a reasonable construction.  No one but the reporter could furnish the information, and he could not do so without laborious investigation.  He made the effort and located the testimony, but at what time he was prepared to read it the record does not show.  It may have been after the verdict was reached by the jury.  At any rate, there was no disposition apparently on the part of said reporter, or of the trial judge, to withhold from the jury what they requested, and preparation was made to comply with the request.  But it is manifest that the jury, after further consultation, concluded that they did not need the additional information, and they could and did agree upon a verdict without waiting to have the said testimony read.  As seen, it had been stated by the foreman that they might thus be able to agree, and we must conclusively presume, in the absence of any showing to the contrary, that they were entirely satisfied to forego the reading, believing that it would not affect their conclusion as to the guilt of the defendant. There is nothing in the matter to indicate any improper conduct on the part of any officer of the court or of the jury, nor can it be said that any harm was thereby done to appellant.

It is insisted with frequent repetition that there is no proof of the act upon which the district attorney elected to rely. In this, appellant is entirely mistaken.  The evidence is set out in the brief of the attorney-general.  The salacious story need not be repeated.  The testimony of the prosecutrix is

direct and positive as to the consummation of the offense at the time and place alleged. Her credibility was, of course, matter of argument before the jury and the trial court. The considerations suggested, affecting her veracity, were, no doubt, forcibly presented at the proper time in that tribunal, but they failed of their purpose, and we are in no position to say that she did not tell the truth when she attempted to relate the occurrence in question.

Appellant is also in error when he asserts that the uncorroborated testimony of the prosecutrix is insufficient to warrant a conviction. There are some early decisions to that effect, but such is not the law as now recognized in this state.

In *People* v. *Logan,* 123 Cal. 414, [56 Pac. 56], it is said: "Upon the trial of a defendant accused of rape, if the evidence of the prosecuting witness is sufficient to support the verdict, the truth or falsity of her evidence is a matter for the jury, and a verdict of conviction will not be disturbed, notwithstanding conflicting evidence for the defendant, and notwithstanding the circumstances and conditions forming part of the *res gestae* of the offense are unusual, and not entirely convincing."

It is true that her testimony should be clear and convincing, but it is for the jury and the trial judge to determine whether it fulfills that requirement, and the record here shows that their conclusion was against the contention of appellant. We may say, also, that there was some circumstantial corroboration of the testimony of the prosecutrix to which, no doubt, some heed was given. Manifestly, the jury should exercise the greatest care and circumspection in considering the evidence in cases of this character, as was aptly said in *People* v. *Price,* 26 Cal. App. 544, 550, [147 Pac. 591]. They were so instructed in the present instance and we cannot say they failed to observe the admonition.

Many circumstances tending to discredit her testimony are pressed upon our attention. It is urged that she was strongly impeached and discredited by her own voluntary and repeated repudiation of the charge, that it is so inherently as well as circumstantially improbable, and the great preponderance of the evidence is to the effect that the testimony given by her on the trial of the case is absolutely false. Hence it is argued that the verdict must be the result of passion and prejudice, and "a conviction upon such evidence would be

a blot upon the jurisprudence of the country and a libel upon jury trials." (*People* v. *Hamilton,* 46 Cal. 540.)

That she had made contradictory statements was, as we have seen, the subject of explanation and the value of it as a probative fact was for the jury. That on behalf of the defendant there was much evidence in irreconcilable conflict with the testimony of the prosecutrix cannot of itself justify us in setting aside the verdict. These considerations are amply discussed in *People* v. *Kaiser,* 119 Cal. 458, [51 Pac. 702] , *People* v. *Lewis,* 18 Cal. App. 359, 364, [123 Pac. 232] , *People* v. *Preston,* 19 Cal. App. 675, 679, [127 Pac. 660] , *People* v. *Crawford,* 24 Cal. App. 396, 403, [141 Pac. 824] , *People* v. *Rongo,* 169 Cal. 71, 75, [145 Pac. 1017], and no further comment is deemed expedient. But if we could say that her story is inherently improbable we should, of course, have no hesitation in branding it as false and malicious and awarding appellant the relief he seeks.

In support of his contention that her charge is incredible, appellant calls attention to the peculiar and unusual circumstances attending each occasion of immorality as related by the prosecutrix, and the improbability of the story is enhanced and emphasized, so it is claimed, by "the established good character of the defendant for decency and morality, prohibiting the belief that he did the monstrous and depraved things the prosecutrix in her destructively self-contradictory testimony says he perpetrated against her virtue. Surely the defendant's good character as a minister of Christianity established by thirty-three years of constant devotion to the maintenance and advocacy of religion and morality should be and is a powerful circumstance indicating the great improbability of the accusation that has been made against him at the sinister instigation of his enemies, by a woman who it must be conceded is not 'above suspicion and reproach.' Says a learned court: 'Character under all circumstances is the best earthly inheritance. It is a shield to the innocent when unjustly accused.' (*United States* v. *Emerson,* 6 Mc-Lean, 406, [Fed. Cas. 15,051].)'' The considerations, thus forcibly set forth, are of great significance and potency, but we need not dwell upon them at length. As to the peculiar circumstances of the various delinquencies we may say they do not stamp the recital of the prosecutrix with inherent improbability, but they furnish the basis for a persuasive

argument against the truth of her statements, and, no doubt, this feature of the case was conscientiously considered by the jury. It does, indeed, seem strange and almost incredible that any man in his senses would commit such an offense under such circumstances, but we cannot say that it is so unbelievable that the jury had no legal right to accept the story told by the prosecutrix. (*People* v. *Moore,* 155 Cal. 237, 241, [100 Pac. 688].) The profession to which he belonged was a circumstance, also vastly in favor of appellant's innocence. No higher calling ever enlisted the services of mankind, and it must be said that nearly all who are engaged in this great work are worthy of the respect and confidence of all upright people, but they are subjected to peculiar temptations along the line of this regnant impulse, and occasionally one falls and some of them, of course, are ''wolves in sheep's clothing.'' We need hardly say that there are many historical examples of similar and other crimes committed by persons of high standing in the community under circumstances more strange and startling than are revealed in the case before us. It is especially true of this character of offenses. It is the old story, as old as the history of the race —of man yielding to the almost irresistible coercion of the strongest instinct of animal life. Indeed, we have the authority of Paul, the greatest preacher that ever lived, that there is a constant strife between the carnal and the spiritual forces for supremacy in man's nature, and he himself found it necessary to be constantly on his guard lest he become a castaway. Cases equally as strange have come under the observation of all of us and many of them could be readily recalled.

Of course, this might have been an unjust conviction. Mr. Slaughter may have been the victim of a foul conspiracy. If so, a monstrous wrong has been committed, but we are not in a position so to determine or so to declare. The responsibility of passing upon such considerations is not lodged with us. Finding, as we do, sufficient evidence to support the verdict and an absence of prejudicial error in the record, and having no means of determining that there was a miscarriage of justice, we can do nothing else than affirm the judgment; for it is not true, as contended by appellant, that under amendment 4½ of article VI of the state constitution we are authorized to weigh the evidence and judge of the credibility

of the witnesses and thus virtually try the case anew. That amendment has been the subject of frequent exposition and we need not add to the discussion. However, we may say that in view of the record it is impossible for us to be "satisfied" that an injustice was done to the defendant. We cannot say, as declared by appellant, that the verdict was the result of "the impassionate clamoi of the mob, of the intemperate indignation of the multitude," or that it was influenced by "the mad assaults of a sensational and hysterical public press," but we are required to hold, rather, that it was the conscientious judgment of a jury anxious to do right and to vindicate the law, like "the true judicial opinion" of which appellant speaks, resembling "the magnificent nobility of the great ocean in its mighty grandeur; calm and dispassionate in rest, eternal in power." It is true that the law "condemns with intransigent denunciation, a verdict or decision that is induced by passion or prejudice and exacts from the courts a stringent supervision, as well as a liberal exertion of remedial power to redress a grave wrong destructive of justice and the supremacy of the law." But the mandate is equally insistent that the courts content themselves with the exercise of the power committed to their hands by the constitution and the statutes, and that they refrain from an unwarranted interference with the prerogatives and duties assigned to other agencies by the deliberate action of the sovereign power of the state.

The judgment and order are affirmed.

Chipman, P. J., and Hart, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on June 2, 1917, and the following cases cited: See *People* v. *Davis*, 147 Cal. 346, [81 Pac. 718] ; *Burke* v. *Maze*, 10 Cal. App. 206, 211, [101 Pac. 438, 440].