[Crim. No. 236. Third Appellate District.—May 7, 1914.]

## THE PEOPLE, Respondent, v. WILLIAM CRAWFORD, Appellant.

CRIMINAL LAW—RAPE—FEMALE UNDER AGE OF CONSENT—SUFFICIENCY OF UNCORROBORATED EVIDENCE OF PROSECUTRIX TO SUPPORT CONVICTION.—In this prosecution of a man for sexual intercourse with his daughter when she was under the age of consent, the uncorroborated testimony of the prosecutrix was sufficient to support a conviction, although she contradicted herself time and time again while a witness and even denied many times that. the defendant had intercourse with her, and although importunity and persistent effort on the part of the district attorney were necessary to elicit statements incriminating the defendant.

ID.—IMPEACHMENT OF PROSECUTRIX—CALLING ATTENTION TO HER TESTIMONY BEFORE GRAND JURY.—In such prosecution it was proper for the district attorney, when the prosecutrix gave damaging evidence against the people, to call her attention to inconsistent testimony which she gave before the grand jury.

ID.—WITNESS FALSE IN PART—INSTRUCTIONS—WHEN NOT PREJUDICIAL ERROR.—An instruction to the jury that "if any witness examined before you has willfully sworn falsely in this case to any material matter, it is your duty to. distrust his entire evidence," while not a strictly correct statement of the law, was not prejudicial in this case, since, considering the instructions together, the jury must have understood that while they were to look with suspicion upon the entire testimony of a witness who had willfully sworn falsely to a material matter, it was their exclusive right to weigh the evidence and to judge of the credibility of this as of other witnesses.

APPEAL from a judgment of the Superior Court of Glenn County and from an order refusing a new trial. Wm. M. Finch, Judge.

The facts are stated in the opinion of the court.

Geis & Geis, for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

BURNETT, J.—Sexual intercourse under the age of consent was the offense charged in this case, a conviction was

secured on the uncorroborated testimony of the prosecutrix, who is the daughter of defendant, and he was sentenced to thirty years in the penitentiary.

Appellant calls attention to the admonition given to the jury, and which is deemed proper in such cases, to view the testimony of the prosecutrix with caution, and claims that it must have been entirely disregarded in the determination of his guilt. It is declared that discredit and distrust naturally arise from the consideration of the manifold inconsistencies and irreconcilable contradictions of the witness and that the jury's conclusion can only be accounted for on the ground of passion and prejudice. To this deplorable result, it is urged, the unfairness of the district attorney contributed in no small degree, and appellant goes even further, in the claim that when fairly considered the record does not furnish sufficient support for the verdict.

The following portions of the transcript relating to the testimony of the girl are probably sufficient to indicate the basis of appellant's contentions. In her direct examination this appears: "Q. Did your father have and accomplish with you the act of sexual intercourse? Mr. Geis: We object to that, that calls for the conclusion of the witness. The Court: Overrule the objection. A. Yes, sir. . . . Mr. Purkitt: Tell in your own language just what occurred. A. I can't tell you. Q. Yes you can, you can tell how it happened. The Court: Ask her the question, where he was and what he did and what she did. Q. (By Mr. Purkitt.) Where were you? A. Down at the river, Q. Were you in the house or tent? A. In tent." In answer to further questions she said her father came into the tent and got on top of her and she raised her clothes and this followed: "Mr. Purkitt: Just tell us what went on. A. I don't know what you mean. Q. Did he get his parts into you? A. No, sir, he did not," and she further declared that he "never did." She answered similarly in reference to another occasion and then the record proceeds: "Q. Did it hurt you any that time? A. No sir, not very bad. Q. Did it hurt you some? A. No, sir, not to speak of. Q. Did it hurt any? A. No sir. Q. Why did you say not to speak of? A. Oh it didn't hurt me." The district attorney then, for the purpose of refreshing her memory, as he stated, called her attention to

her testimony before the grand jury as follows: "Q. Now Ada, are you willing to make a clean breast of the entire affair. A. Yes sir. Q. I would now ask you who was the man who had intercourse with you? A. My father." Further questions and answers of the examination before the grand jury were then read, over objection, from which it appears that she minutely detailed the acts of appellant showing the complete offense as set out in the indictment. Then follows: "Mr. Purkitt: Did you testify to that, that way, before the grand jury? A. I don't understand more than half of it. The Court: The question is whether you said that before the grand jury? A. I don't remember whether I said that or not, but he didn't." The witness was then interrogated further about the charge and her answers apparently being a disappointment to the district attorney he asked her where she had been and if she had talked with any one or received any letters or telephones about the case. Nothing of consequence was discovered and the record continues: "Q. What reason do you give for changing your testimony? A. Changing it? Q. Yes. A. I don't know. Have I changed it any? Q. Yes, you have changed it. What reason do you give? A. I didn't know I had changed it any." Her attention was then directed to the fact that she had made a written statement at the time she was before the juvenile court and, in reply to a question by the district attorney whether her testimony now is the same, she replied: "Yes, it is; I think it is. I might have not said every word the same, but then." She was then again taken over the same ground with the same result and the district attorney read what purported to be a written statement by her at the time of the said juvenile court examination and this follows: "Q. Did you write that? A. Yes, I wrote it. Q. That's so, is it? A. I made a mistake there, he never raised my clothes. I did that myself. Q. Why did you put that in here? A. I don't know. I didn't think I guess, or something. I don't know why I did it. Q. You are willing now to take that on to yourself? A. Yes, sir. Q. All the blame on yourself? A. I am, because he never raised my clothes at all." Again she was asked if she had talked with any one who told her to change her testimony and she answered: "No sir. I never spoke a word to anybody only just Mrs.

Stochhinni and she didn't say anything. Q. How came
you to change it? A. I don't know. I never had no
notes or letters nor nothing only just that one letter. I
haven't talked to nobody. Q. How come you to change it?
A. I don't know how I did. Q. Didn't you change it to pro-
tect your father? A. No, sir. Q. If your testimony to-day
is correct, why did you give that testimony before the grand
jury that you did that I just read to you? A. I don't know
why I did." The district attorney then read further from
her testimony before the grand jury and in response she
said: "Well, he didn't. Q. Why did you say then that he
did? A. I don't know why I did. Q. That's all the ex-
planation you want to give? A. Yes sir. Q. Just read this
over and see if that is correct, will you? Just read it quietly
to yourself and see if that's correct. (Witness reads paper.)
That's correct what you wrote there? A. No sir, it isn't.
Some of it isn't." She was again taken over the ground
covered by the charge and the concluding portion of this
part of the examination was as follows: "Q. He did get on
top of you? A. No. Q. Why did you tell me a while ago
that he did? This is no plaything here. We want the truth.
Now tell us what took place there. A. I was turned over
to him, just the same as being on top of me, pretty near. Q.
Why did you say a while ago that he was on top of you?
A. Ain't that the same thing? Q. No, I don't think it is the
same thing. You were laying down and he was on top of
you you said a minute ago and now you say he was sidelings.
A. He was laid down and so was I. . . . Mr. Purkitt: What
do you mean by changing your testimony, coming up here
now and changing it? Has anybody made any signs to you
at all? A. No sir. Q. Wouldn't you feel better to tell me
the whole facts as they occurred there, straightforward, in
your own way? A. I have told you. Q. You haven't told
us all. A. Yes I have. Q. Well, we will go all over it again
if it takes a week." The defendant then objected to the
threatened course of the district attorney and the court said:
"In order that the district attorney may get the former tes-
timony and look through his notes, we will take an adjourn-
ment until tomorrow morning at nine-thirty." Thereupon
counsel for defendant asked for the strict enforcement of the
rule that the witness "be not permitted to talk with any

person connected with this case in any way at all." To this the learned trial judge responded: "The court will take care of this witness. Court is adjourned." On account of illness of defendant's counsel the trial was continued the next day till the day after. The district attorney began again with the witness at the beginning of the story and, after the girl had stated that her father came into the tent and got into bed with her and the other children, the record proceeds: "Q. What did he do? A. He got on top of me. Q. Then what? A. That's all, I guess. Q. Tell us what he did when he got on top of you. Tell the jury what he did when he got on top of you. A. He had intercourse with me I guess. Q. You know what he did, don't you? A. Yes. Q. And he did insert his private parts into you? A. Yes sir. Q. Anything come from him? A. Yes, sir." In response to questions she then related two other similar occasions in Tehama County and the direct examination here concluded as follows: "Have you any reason to give the jury why you didn't tell us this day before yesterday? A. Yes sir. Q. What was it? A. I thought I could protect my father some way. Q. At the time you had intercourse at Jelly's Ferry or here, did he say anything to you? A. Yes sir. Q. What did he say? , A. He told me not to tell."

In cross-examination she was interrogated at great length about her testimony before the grand jury and she declared it was untrue as far as it tended to criminate Mr. Lunceford and exculpate her father. She also stated again that she falsified to protect her father. She admitted also that she told Judge Farnham and one time Judge Finch and also the district attorney that it was Lunceford; then follows this: "Q. Did your mother ask you to tell the story that you told here? A. She told me in the first place that she was going to make trouble over it. Q. Did she ask you to tell the story in order that she might get hold of the children? A. Yes sir. Q. Did she tell you before you told her that your father had had intercourse with you or afterwards? A. Afterwards." Her attention was then directed to the particular circumstances surrounding the alleged intercourse and these questions and answers appear: "Q. Do you remember anything at all about that evening simply save and except the fact that you had intercourse? A. No sir. Q. Did you have a light in

your room or your tent? A. No sir. Q. Was it dark in there? A. Yes sir. Q. What was said? A. Nothing was said at all. Q. Not a word spoken? A. No sir. Q. He got up and went out and not a word said? A. Yes sir. . . . Q. This might have been somebody else might it not? A. It might have. I don't know. Q. You wouldn't tell who it was? A. No sir. Q. Just somebody came in there and had intercourse with you and went out? A. Yes, sir. Q. And it was dark and you couldn't see who it was? A. No, I couldn't see who it was. Q. That was the only time that anybody ever had intercourse with you in this county, wasn't it? A. Yes, sir. Q. You wouldn't pretend to say, would you, who it was? A. No, sir. Q. It might just as well have been some person else over there? A. Yes, sir. Q. You don't want to be understood as saying it was your father? A. No sir. Q. Because you don't know? A. I don't know. Q. It might have been Lunceford? A. Might have, I don't know who it was." Then on redirect the following appears: "Mr. Purkitt: Then on the fifteenth day of April your father did have intercourse with you down at that place? A. Yes sir. Q. You know it was your father, do you? A. No sir, I couldn't say for sure it was him because it was dark there and I couldn't see. Q. Now, Ada, cutting off the matter at Jelly's Ferry, we will commence again and go all over this, so we can't be mistaken." The district attorney then called her attention to her former statements and the record proceeds: "Mr. Purkitt: Now at the time your father came in in April, was the time he came and had intercourse with you down at the camp? A. Yes, in the night. I guess it was him. I don't know who it was. It was dark and I couldn't see. Q. Who have you been talking to since you got out of here? Don't you know it was your father? A. I don't know. Q. You know he had been doing it to you and you know he was the fellow that had done that down there? A. I don't know whether it is or not. Q. Now at the time you told your mother this story, did she tell you to tell the truth about it? She told you to tell just exactly how it was, didn't she? A. Yes, she told me to tell what I did. Q. And tell the truth about it? A. She didn't say to tell the truth, but she told me to say that it was. She didn't say whether to say the truth or not. Q. She said to say what happened? A.

Yes, for me to say it was papa. Q. You had already told her before that that it was papa, hadn't you? A. Yes, sir." Several times thereafter she was asked if she didn't know it was her father and she reiterated the answer: "I don't know whether he did or not." The redirect examination finally concluded with these questions and answers: "Mr. Purkitt: Let's fix the time, was it in March or was it in April, 1913, that your father had intercourse with you on the Estes Ranch, at the fish camp in Glenn County, California? A. April. Q. At that time he inserted his private parts into your private parts? A. Yes sir. Q. And something came from him? A. Yes sir." But the ordeal was not yet over for the unfortunate girl. She was taken upon re-cross and stated several times that she didn't know who it was, that she wouldn't state it was her father. Each counsel seemed determined to have the last word with her, so there was a re-redirect examination. In that, among other things, this appears: "Q. You remember testifying this morning the time when I was asking you the questions that the shorthand reporter read back to you? A. Yes. Q. Since then you have changed your testimony, have you? A. Yes sir. Q. Have you changed that to protect your father? A. No. Q. Why have you changed it? A. I have changed it because it is right what I have told you. Q. Well, we will have to go all over this again." The district attorney then read her former statements directly charging her father and she admitted they were correct. On her re-recross examination she qualified them as before, stating she didn't know it was her father, and, with one or two questions by the court, the long examination of the witness came to an end.

To exhibit clearly the ground of appellant's charges it seemed necessary thus to set forth at considerable length the record of the proceedings.

We cannot, of course, say that the jury disregarded the admonition to consider with caution the testimony of the prosecutrix. In view of the gravity of the offense, the serious consequences of conviction, and the palpable inconsistencies and contradictions of the witness, it would be a reflection upon the honesty or intelligence of the jurors to hold or to suggest that they did not scrutinize that testimony with the utmost care.

It is equally certain that the decision as to the sufficiency of the evidence must be against appellant. It is settled that a conviction may be had upon the uncorroborated testimony of the prosecutrix. She testified positively to acts from which only one inference could be drawn, to wit, that the defendant is guilty of the offense charged. We cannot say that said testimony is inherently improbable. While it excites wonderment and horror it is no different in that respect from other shocking crimes that are of frequent occurrence. Nor are we authorized to say that because the witness contradicted herself time and time again, and denied many times while on the witness stand that her father had carnal connection with her, her testimony of incrimination is unworthy of belief and legally insufficient to uphold the verdict. That would be to invade the exclusive province of the jury to weigh the evidence and determine the credibility of the witnesses. The test here is not whether the witness is truthful, but whether it can be said that her testimony in favor of the verdict is inherently untrue. The jury may legally base their verdict upon statements which they believe of a witness known to be testifying falsely in material parts of his testimony. It is apparent and must have been to the jury that the testimony of the prosecutrix is surcharged with falsehood and that circumstance cast suspicion and discredit upon the entire recital, but it did not require the rejection of what was believed to be true. It can be readily understood how the jury must have viewed the situation and made allowance for the natural desire of the child to protect her father. No doubt the jurors believed that while it was not strange nor incredible that the prosecutrix would *falsely* avow her father's innocence it was almost unthinkable that she would *falsely* charge him with the crime.

Nor is it singular that great importunity and persistent effort were required to exact of her a statement inculpating the defendant. Ready willingness on her part to lay the unspeakable crime at her father's door would be more surprising than her apparent reluctance to tell the truth. At any rate, there is legal evidence to support the verdict and we cannot say that it is insufficient for that purpose. (*People* v. *Kaiser,* 119 Cal. 458, [51 Pac. 702]; *People* v. *Preston,* 19 Cal. App. 675, [127 Pac. 660, 665].) In the latter case it

is said: "But, whatever the nature or character of the contradictions or inconsistencies she might have been guilty of in detailing her story, it was after all for the jury to decide whether such contradictions or such inconsistencies were· of such significance as to have the effect of impeaching her statement as to the fact of the asserted sexual intercourse. In such a case as this, the appellate courts are not authorized to substitute their judgment for that of the jury and the trial court or to the weight and effect of the evidence."

It may be said, also, that while the district attorney was very persistent in his examination of the witness, we must presume that he was animated solely by a desire to elicit the truth and that his conduct does not appear to merit condemnation.

Objection was made by defendant to the questions addressed to the witness as to her testimony before the grand jury. In *People* v. *Bushton,* 80 Cal. 161, [22 Pac. 127, 549], it is said: "It is contended that the court below erred in allowing purported testimony of the prosecuting witness, Hernandez, given at the coroner's inquest, to be read in the presence and hearing of the jury and in allowing the coroner to give evidence of the purported testimony given before him by Hernandez on that ·occasion, and that it erred in not striking out such evidence as hearsay. The evidence referred to was introduced for the purpose of impeaching the witness, Hernandez, who had been put upon the stand by the prosecution, and testified in such a way as to prejudice the people's case, and inconsistently with the testimony given by him at the coroner's inquest. It was proper, for this purpose, to call the attention of the witness to what he had testified before the coroner, and read the same in the presence of the jury, and upon his denial of said ·testimony, to prove that he did so testify. (Code Civ. Proc., secs. 2049, 2052.)" But such evidence is not admissible where the witness has simply failed to testify to all that the party calling him expected or desired. (*People* v. *Mitchell,* 94 Cal. 550, [29 Pac. 1106].)

"Upon this subject the court has never gone further than to hold that where a witness called by a party has given damaging testimony against him, . . . the party calling him may show that the witness previously made statements inconsistent with his present testimony, and this ruling is apparently upon

the theory that the party was surprised by the adverse testimony given by his own witness.'' (*People* v. *Creeks,* 141 Cal. 532, [75 Pac. 103] ; *People* v. *Cook,* 148 Cal. 345, [83 Pac. 43].)

It is apparent that this case falls clearly within the rule as thus limited. The child had given damaging evidence against the people in that she had virtually denied a fact that was essential to conviction. She had plainly shown herself to be a hostile witness and under the decisions it was admissible to prove her inconsistent statements made on other occasions.

The only other point of serious import relates to the following instruction given by the court : ''If any witness examined before you has willfully sworn falsely in this case to any material matter, *it is your duty to distrust his entire evidence.* I do not intimate to you that any witness in this case has testified falsely. These matters are exclusively within your province as jurors and are not to be determined by the court.'' We have italicized the portion of the instruction to which the exception is taken. The claim is that the court thereby curtailed the exclusive function of the jury to determine the credibility of the witnesses; in other words, that if they followed such instructions the jurors, when they reached the conclusion that a witness had sworn falsely as to a material matter, ·must reject his entire testimony although they might believe that in other material matters the witness had spoken truly. Respondent contends that taking the instructions together the jury could not have been misled. In this connection attention is called to various instructions setting forth the right and duty of the jury to pass upon the evidence, among others, the following: ''The court instructs you that to the jury exclusively belongs the duty of weighing the evidence and determining the credibility of the witnesses. In determining the credibility of a witness the jury may take into consideration the character, conduct and manner of the witnesses upon the stand, their relation to the controversy and to the parties, if any, their bias or impartiality, the reasonableness or unreasonableness of the statements made, the strength or weakness of their recollection, viewed in the light of all the testimony and facts and circumstances in the case. It is the province of the jury to determine the weight and credi-

bility to be given the testimony of the prosecutrix as well as that of all other witnesses testifying in the case."

As stated in *People* v. *De Lucchi,* 17 Cal. App. 103, [118 Pac. 935], the criticised instruction is not "a strictly correct statement of the law." It would be better to have given the familiar apothegm of the statute: "That a witness false in one part of his testimony is to be distrusted in others." But, considering the instructions together, the jury must have understood that while they were to look with suspicion upon the entire testimony of a witness who had willfully sworn falsely to a material matter it was their exclusive right to weigh the evidence and to judge of the credibility of this as of other witnesses. We think the jury could not have understood that they were instructed to *reject* all the testimony of such witness, but that while they were to regard it with suspicion it was their exclusive province to determine the truth or falsity of the statements. We may adopt here what was said by Mr. Justice Sloss, in *People* v. *MacDonald,* 167 Cal. 545, [140 Pac. 256], as follows: "It would be a better practice, in matters of this kind, to adhere to forms of expression that have had the direct sanction of appellate courts. At the same time, we do not think the instruction read in its entirety was substantially prejudicial to the appellant's rights."

Another answer might be made to appellant's contention here, and that is that it does not appear that the instruction was not given at the request of defendant. We cannot, of course, presume error and if the criticised instruction was not given at his instance defendant should have had it so appear.

We have carefully examined the record, but have found no error that would warrant a reversal of the judgment or order denying the motion for a new trial, and they are, therefore, affirmed.

Chipman, P. J., and Hart, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on July 6, 1914.