[Crim. No. 2329. First Dist., Div. Two. Dec. 7, 1945.]

THE PEOPLE, Respondent, v. GEORGE HOLMAN, Appellant.

Alfred J. Hennessy and J. Maxwell Peyser for Appellant.

Robert W. Kenny, Attorney General, David K. Lener, Deputy Attorney General, Edmund G. Brown, District Attorney, Thomas Lynch, Chief Assistant District Attorney, and Alvin Weinberger, Deputy District Attorney, for Respondent.

GOODELL, J.—The appellant was convicted of murder of the first degree with the recommendation by the jury of imprisonment for life. He was sentenced accordingly, and appeals from the judgment of conviction and from the order denying his motion for a new trial.

The indictment contained 22 counts, each based upon the death of a human being. The prosecution was conducted on the theory that 22 murders were committed in the perpetration of arson (Pen. Code, § 189) and that a volatile liquid such as gasoline, benzine or kerosene had been used to accelerate the fire. Twenty-one persons were burned to death in the building in question, 13 of them beyond recognition, and one other, named Mamie Pulaski, either jumped or fell from

a third story window to escape the flames and died at once from a fractured skull.

The site of the fire was the New Amsterdam Hotel at the southeast corner of Fourth and Clementina Streets in San Francisco with a frontage of 50 feet on Fourth Street and a depth of 110 feet running along Clementina, a narrow street or alley. The exterior of the building from foundation to second floor was of brick, while the two upper floors were entirely of frame construction. The building contained about 78 rooms, most of which were 8 by 11 feet in size, the wooden partitions being covered with cheesecloth and wall paper. Two long halls four feet wide, one on the northerly and one on the southerly side, on the second and third floors, ran easterly and westerly, lengthwise of the building and two halls of the same width ran at right angles thereto, one near the front, the other near the rear of the building. There was a large light well in the middle of the structure. In addition to the front stairway, which led up from the Fourth Street entrance, there was a stairway in the rear, and it is around this rear stairway that the principal facts of this case revolve, for it was probably near the point where this rear stairway comes into the second floor that the the fire started.

The principal incriminatory evidence in the case has to do with the actions of the appellant just prior to and at the time of the outbreak of the fire, and for that reason a somewhat detailed description of the ground floor, rear, of the building is necessary. About the middle of the Clementina Street side of the hotel there was a doorway practically flush with the sidewalk, leading into an uncarpeted hall 43 feet long and 4 feet wide running parallel with Clementina Street, off of which hall there were three rooms, 8 by 11 feet, numbered 1, 2 and 3. These rooms were practically at street level, each with a window looking onto Clementina Street. This hall joined at a right angle another hall four feet wide running northerly and southerly across the rear of the ground floor. Opening into the latter hall was the rear stairway, which leads from the ground floor up to the second (and thence to the third) floor. It had two breaks, so that a person would ascend several steps headed westerly, turn left for several steps, then turn again to the left for several steps, headed easterly, and step onto the second floor. The stair well in which these stairs were built was 5 feet 6 inches wide by 8 feet 10 inches long.

Room 1 on the ground floor and nearest to and just east of the doorway, was occupied by one Johnnie Anderson, a colored man who had lived there for some months. Room 2, next door to the east, was the bedroom of one Gertrude Jordan, a colored woman, and room 3, at the east end of the hall and farthest from the doorway, was her kitchen.

On Monday, March 27, 1944, shortly before midnight, fire broke out in the hotel and spread with terrific rapidity. There were 70 or more persons in the hotel at the time. The house was full, one room having as many as four occupants. By the time the fire department arrived in response to the first alarm, which was sounded at 11:55 p. m., flames were coming out of the windows of the third floor on Fourth Street and out of the upper windows on the Clementina side, toward the rear of the building. The testimony shows that the fire was at its worst on the easterly or rear end of the building on the Clementina Street side, although it had spread in other directions through the second and third floors with such speed as to trap many of the unfortunate people who were burned alive.

On the evening in question one Hosey Moore, a colored man, was a visitor of Gertrude Jordan, having arrived at her apartment about the time she returned from work around 6 p. m. They had been friends in Mississippi, 15 years before. He was there all evening and had gone to bed with her. Somewhere around 11:30 p. m. the appellant, a colored man, nicknamed "Bubber," drove into Clementina Street headed east, turned his car around, and parked it facing west with lights dimmed, partly on the sidewalk and partly on the street with its back to that of Gertrude Jordan's car already parked facing in the opposite direction. Both cars were close to and abreast of the windows of Gertrude Jordan's apartment, appellant's beside her bedroom. The appellant rapped on her bedroom window; she asked if he wanted to come in and he said yes. On being admitted to her kitchen (room 3) he asked if she had company and she replied "No more than my half brother," whereupon the appellant testified that he said, "Well, if your half brother is here come on, we will go out in the car and talk." She replied, "No, it is too late." While they were talking in the kitchen she testified that she saw two faces of colored persons (whom she did not recognize) peering through her kitchen window, and became alarmed. She called to Moore and asked if he had any money. This was simply to awaken him because of her fright at seeing the faces outside.

Moore got out of bed and came into the kitchen. She introduced Moore to the appellant as her half brother and according to her testimony she introduced the appellant to Moore as her "ex boyfriend." The men shook hands and, as far as the record shows, chatted in a friendly enough way. The appellant at Moore's invitation had a drink of whiskey with him. Gertrude Jordan testified that the appellant asked her how she and her new boy friend were getting along. This apparently had reference to one Cecil Frazier who lived in room 50 upstairs with another man and a married couple. Room 50 was in the same relative location on the third floor as Anderson's room, number 1, was on the ground floor. She testified that she told the appellant she and her new boy friend were moving out within a few days and were going to live together. Frazier was burned to death in the fire.

The appellant and Gertrude Jordan had lived together in this same apartment, room 2 and 3, for about two months at a time in 1943 while appellant's wife was absent from San Francisco. On the return of appellant's wife this cohabitation ceased but after his wife's return the appellant visited Gertrude Jordan periodically in her apartment on a number of occasions. The relations between the two had become known to the appellant's wife and the police authorities had intervened with a view to putting a stop to them. A day or two before the fire Gertrude Jordan sent word to the appellant through a woman friend that instead of sending her gifts (he used to bring and send her money, groceries and other things) he should call to see her. The appellant testified that his call on the night in question was in response to this invitation. "She sent for me, and I wanted to see what she wanted." The foregoing facts are essentially without contradiction.

Anderson, who had lived for some months in room 1, next to Gertrude Jordan's bedroom, testified that about 11:30 p.m. as he was on Fourth and Clementina Streets he "heard a noise like people fighting, a man and woman fighting" and his attention was drawn to the two parked cars. He proceeded along Clementina to the window of Gertrude Jordan's kitchen, which window was open about four inches from the top, "peeped through" and saw "Holman . . . and this girl Jordan, and he was arguing; they was talking loud"; he stood back to avoid discovery from the inside and heard

appellant say to her ''I will get you for this'' and he sounded angry. He made a mental note of the number of the license plate on the automobile outside the window headed west and on reaching Fourth Street wrote it on a magazine. He went up the front stairway of the hotel to the second floor, looked in at the office for his mail, walked to the rear, down the rear stairs, and entered his own room. He sat on the bed reading the paper and could hear a conversation between Gertrude Jordan and Moore in her apartment, and although he listened intently, he could not make out what was said. Within a few minutes he heard a loud noise upstairs which sounded like fighting, a sort of a roaring noise with loud voices and screaming and, on stepping into the hall, saw the house was on fire. He testified that as he went along the hall the appellant was coming from the direction of the rear stairway and of the fire, carrying a can which Anderson described as a large can (of possibly four or five gallons content). The appellant, he said, was coatless and was running, and bumped into him, knocking against his left shoulder, the impact throwing him against the wall. He testified that the flames were coming down the rear stairway behind the appellant ''like avalanche.'' Anderson testified that he blew a whistle which he carried with him, and a Chinese tenant of a room on the ground floor came out and he told the Chinaman to sound the alarm and get everybody out that he could. Anderson then testified that he ran to the Southern police station to give the alarm and then returned to the alley and rendered aid.

There is no conflict as to the presence of the appellant in Gertrude Jordan's kitchen shortly before the outbreak of the fire. His own testimony shows it. As to his movements from that point on the record is conflicting, and his acts and conduct thenceforth are of course of crucial importance.

The appellant testified on direct examination that he and Moore and Gertrude Jordan were talking in her kitchen when the fire started (that he had been there about 25 or 30 minutes) and that he ran into the hall, got into his car and drove ''right straight.'' On cross-examination when asked how he happened to leave the kitchen he first said he heard the noise above ''just like somebody fighting,'' and that Gertrude Jordan stepped outside the door for just a second, and on returning said there was a fire. He changed this testimony so fast that we quote it:

''Q. Had you been in the kitchen all the time? A. Yes.

"Q. From the time you went in there until the fire broke out you were in the kitchen? A. Yes.

"Q. With Gertrude Jordan and Hosey Moore? A. Yes.

"Q. Had you been in the bedroom? A. Well, yes, I was in the bedroom. I didn't tell it because I didn't want that, because I didn't want my wife to know that I had been in the bedroom with her. I said that's where I was when the fire started, but I didn't want to.

"Q. Where were you when the fire broke out? A. In the bed with Gertrude.

"Q. Then when you stated here on direct examination that you were in the kitchen when the fire broke out, you were not telling the truth, were you? A. Well, you see, I didn't want to tell that on account of the ladies in here. I didn't want to explain just where I was."

He testified that Moore waited in the kitchen while appellant and Gertrude Jordan occupied her bedroom. She denied this, saying, "That is too imprudent and low."

Gertrude Jordan, called by the prosecution on direct examination testified that when the fire started the appellant was in her kitchen talking to her and Moore. This took the prosecution by surprise and on cross-examination she was confronted with her testimony before the grand jury and with statements she had given to the district attorney's staff and other investigators to the effect that appellant had left her apartment before the fire started. She explained this discrepancy by saying that she and the appellant had agreed on the latter version because of the trouble that already existed between the appellant's wife and herself, and the truth which she then asserted—that he was in her apartment when the fire started—would cause further trouble.

Toward the end of the trial she was recalled to the stand. The judge indicated that information had come to him that she desired to explain her former testimony. On this examination she testified that the appellant had *not* occupied her bedroom that night, but had visited her kitchen and had left at least 10 or 15 minutes before she discovered the fire and that after he left she and Moore had returned to bed and were in bed when the noise above was heard.

Moore testified that at the time when he heard noises upstairs indicating something was wrong he and Gertrude Jordan had returned to bed and the appellant had been gone

for about 5 or 6 minutes. During that interval he said she told him she was nervous.

The witness Melvin Warren Grau, an enlisted man in the navy, testified that at about 11:45 p.m. he was walking south on Fourth Street, toward the bay bridge (on his way to Vallejo) and immediately on reaching Clementina Street saw a woman coming out of a third-story window of the hotel, and land "partly on the sidewalk and partly on the street." He went over and looked at her "and she looked dead." He saw no evidence of fire when she came out of the window. He marked on an exhibit where an automobile was "parked partly on the sidewalk and on the street," indicating abreast of Gertrude Jordan's window. He testified that a colored man "kind of heavy set" (the appellant is heavy set) came running out of the side door, got into an automobile, and "It drove off and drove over the woman that was laying in the gutter," "run right over her knees" and was driven toward Fourth Street. The witness "saw the signs of the fire when I got him coming out of the building; I got him and the fire at the same time." The fire was "Towards the back of the building. . . . It was . . . a terrific fire." On cross-examination Grau testified that the woman struck the sidewalk "Possibly between this first window [Anderson's room] and the doorway." The witness did not see flames coming out of the doorway as the man came out, but "from the back of the building, shooting upwards." The fire was on the second and third floors. The witness said 10 or 15 minutes elapsed after the man ran out until the engines came. About an hour later he spotted the car that ran over the woman, parked on the other side of Clementina and across Fourth Street.

The witness Ira Eisenhauer, an occupant of rooms 22 and 23, on the second floor, (immediately above Gertrude Jordan's two rooms) testified that about 11:40 flames came through the transom; he "couldn't make it" through the door, so he and his wife got out the window. When he raised the window he saw "A party screaming, and someone jumped out the window" on the top floor. He saw Mamie Pulaski falling through the air. "She hit on the sidewalk there. And I seen a car run over her" legs. She fell forward of his room. He saw two automobiles in the alley at that time. He first saw the person (who got into the automobile) on the sidewalk running. He saw him drive out of the alley. The body lay in front of the automobile. The automobile "went over it." The witness could not say whether the man was white or colored or where

he came from. This witness also estimated that it was "about 10 or 15 minutes, probably" before the fire department got there. The witness did not see anything in the hands of the man who was running. "I didn't pay no attention to what he had. I just noticed him running."

Fire Marshal Frank P. Kelly, whose duty it is to investigate and determine the cause of all fires occurring in San Francisco, has been connected with the fire department for 35 years, for 18 of those years he has been fire marshal, and has investigated thousands of fires. He happened to have been close to the scene and arrived within a minute or so after the first alarm was sounded at 11:55 p.m. He testified to what he observed when he arrived, which was before the fire apparatus got there, and to other matters connected with the fire and rescue work, but we are concerned chiefly with his testimony as to the origin of the fire. However, he testified that upon his arrival fire was coming out of the windows on the third floor, Fourth Street side, and out of the window off the fire escape on the second floor (Clementina side) which is just above room 2. "There was not very much evidence of fire on the ground floor at that particular time" he said.

He inspected the premises six to eight times after the fire and expressed the opinion that the fire originated in the rear stairway on the easterly end of the building and "right in the vicinity of the second story landing" "between the second floor and the ground floor." He based this opinion on the "manner in which the floor had been burned, together with all of the flooring, and a great number of the wooden joists that supported the floor at that particular point, together with the wooden stairway completely burned away from the first floor to the third floor and through the roof; and then, as it travelled from that particular point down the northerly hallway in a westerly direction, and down the southerly hallway in a westerly direction—and the burning, as it travelled, not showing as much burning as what it would be at the point of origin." He testified that most signs of burning were "in . . . the rear stairwell, from the first floor up to the second, together with the floor and the wooden joist that supports the floor, all in the vicinity of the stairwell." He testified as to his observations of the fire first coming out of the upper story, and on the second floor, and later on the first floor, of the building. He would not say that that was the usual course for a fire to follow. From the manner in which it burned he would not

attribute the fire solely to the materials within the building, but "to the rapidity with which it traveled—that something had been used to accelerate the fire" some volatile liquid such as gasoline, benzine or kerosene. He testified that the usual course of a fire in a wooden building was to burn upward. When asked what would cause a fire to burn downward, he answered, "There could be a liquid used flowing down the stairs, ignite it, and cause the fire to travel downward."

Forty-four witnesses testified in this trial, which lasted several weeks. Many of them gave descriptions of the fire and their own particular experiences, in no way relating to the origin of the fire. It is needless to summarize all this testimony, but is sufficient to say that the fire had gained such headway in the first few minutes that the firemen on arrival could get no further into the front of the building than the first landing, midway between the street and the second floor. The building was not burned down but the two upper floors were thoroughly gutted. We have summarized only such evidence as bears, or might bear, on the actions of the appellant, with particular relation to the time when he left the apartment.

The appellant denied having had a can on the premises or having run down the stairs or having bumped into Anderson in the hall. The appellant at the time operated a restaurant on Sixth Street, and some days after the fire a 5-gallon gasoline can was found by the police at his restaurant. The witness Franklin testified that on Saturday, two days before the fire, the appellant had bought from him 5 gallons of "black market" gasoline, and he identified the can, not as the same one he had sold to appellant on that occasion, but as one of his containers. Appellant had bought gasoline from this witness before on several occasions and testified that he needed it in touring through the country to pick up food for his restaurant. Gertrude Jordan testified that after the appellant's departure that night and she and Moore had returned to bed they heard a noise "after he walked down the hall a piece" which sounded like a tin can outside the apartment being picked up. The 5-gallon can in court was lifted, by way of demonstration, made a noise, and Gertrude Jordan testified that the sound they had heard was similar. Moore gave similar testimony.

Moore also testified that as he went down the hall, after the fire had been discovered he "noticed something like it was wasted on the floor." It was wet. And Gertrude Jordan testified that as she went into the hall after the fire broke out she saw "something on the floor that looked greasy" and

later "something on the floor that looked like water or grease" it looked "dark-like" and "There was a great deal of it right at my door." She was certain it was not there when she came in from work that evening. She admitted that she did not smell anything. Moore testified that he heard the appellant say to Gertrude Jordan, as she was going into her bedroom and as appellant was leaving her kitchen, that he would get even with her. This, of course, was corroborative of Anderson's testimony that he had heard a similar threat, but in different words, through the kitchen window. Moore admitted that the appellant did not look mad when he uttered these words. Gertrude Jordan testified definitely that she did not hear any threat that night. Moore testified that he did not tell her of having heard the threat until they were out in the alley, when the fire was almost over. He said that she then remarked that she had not heard the threatening words spoken.

In addition to the testimony already summarized Gertrude Jordan gave some very damaging testimony against the appellant. It was toward the end of the trial and after she had been recalled to the stand by the judge and had stated that appellant had left her apartment *before* the fire was discovered by her (which was in accord with her testimony before the grand jury) and well after the evidence establishing the corpus delicti had been introduced. It was as follows:

Appellant's counsel on cross-examination read to her as follows: "Q. You also testified before the Grand Jury, and you testified here, that on several occasions, that you asked Holman if he had burned the building down, did you not? A. Yes, I asked Holman." The witness then volunteered the following: "And you don't know the answer he give me. If you did it would hush your mouth; you would shut up and wouldn't say another word." There was no motion made by the appellant to strike out this volunteered statement. On redirect examination by the People she testified:

"Mr. Lynch: Q. Mrs. Jordan, just before you left the stand this morning you testified that you had a conversation with Mr. Holman, at which time you asked him if he had burned the building down. Is that correct? A. Yes, I did." This conversation was out on Oakdale Street, about 3 days after the fire, she thought, and nobody was present but herself and the appellant.

"Q. After you asked him if he burned down the building, what did he say? A. He said yes, he burned the building.

"Q. Did he say anything else? A. He told me I better let it alone; if I didn't I would be found in the Bay."

Following that she was asked if the appellant ever threatened her on any other occasion and answered "Yes. I was frightened of Holman." He had threatened her several times, she said. Some time back she testified, "He told me if——after I quit him, he told me, in the presence of my husband, he told me before I quit him, in the presence of my husband, if I did him like I did my husband he would kill me.

"Q. When was that, Mrs. Jordan? A. That was some time back.

"Q. Was that after you left Mr. Holman? A. It was after I quit Mr. Holman.

"Q. On how many occasions did he make a statement of that kind?

"A. He made statements like that to me quite often, after we got on bad terms.

"Q. What else did he say to you? A. During that time?

"Q. Yes. A. He told me about this fellow Ola Bell told him about. He told me he bet I never moved in the house with him—the boy that got burned up. And I asked him if he burned the building up on that account. He said, 'Well, it is a good thing Hosey was there that night.'"

At several places in the record Gertrude Jordan gave conversations she had had with the appellant after the fire. At one of them "He said 'Well, Baby, one thing, you can save me or sink me'." On other occasions "Don't tell nobody I was there" and "He told me to tell them he was in the room if I had to" and again "If the law happened to ask me anything concerning the fire, to tell them he was in the kitchen—me and him and Hosey."

The testimony of Anderson is claimed to be self-contradictory and "either a fantastic mass of perjury or else the product of a disordered mind." It is argued that Anderson could not have heard loud talking when he was at the corner of Fourth Street, when Moore, who was right in the apartment, heard no loud talking. Anderson's testimony that he peeped in through the window is corroborated by Gertrude Jordan's testimony that she saw faces through the window. The evidence is uncontradicted that the window was open about 4 inches from the top. And the jury may have believed that Anderson heard loud talking, and Moore did not, because Moore was asleep until Gertrude Jordan awakened him after she had seen the faces at the window, and that thereafter the

talk toned down. There is nothing inherently improbable about this. Appellant admits that Moore's testimony as to the threat is corroborative of Anderson's, and *vice versa,* except as to the details of the words used. It is altogether possible that two threats were made, one in a loud tone first heard by Anderson, the other in a milder tone later heard by Moore. This was purely a question of fact and the physical surroundings, as detailed earlier, were all laid before the jury.

The testimony of Moore, likewise, is claimed to be self-contradictory. Moore, unlike Gertrude Jordan and the appellant, never changed his testimony. The only particular in which the appellant claims self-contradiction is where, before the grand jury, Moore testified that Anderson had come into Gertrude Jordan's kitchen during the evening to wash some clothes, and at the trial gave no such testimony. This might appear to be collateral matter but its importance is in connection with the testimony already discussed, of Gertrude Jordan and Moore that they saw something wet on the floor outside her door from which it is argued by the defense that when Anderson returned to his room, next door, water might have dripped onto the floor from the wet clothes, thereby accounting for the liquid which Moore and Gertrude Jordan both said they saw.

The testimony of Gertrude Jordan is likewise claimed to be self-contradictory, and it certainly is. She told the grand jury, the district attorney's staff and fire authorities investigating the case that the appellant had left her kitchen *before* the fire broke out. She told the trial jury that the appellant was *in* her kitchen when the fire broke out. And, finally, when she resumed the stand she went back to her original version. She gave a lengthy explanation as to her reasons for switching. The rule "That a witness false in one part of his testimony is to be distrusted in others" (Code Civ. Proc. § 2061, subd. 3) "is one solely for the guidance of the trial court and can have no pertinency in an appellate court." (*Robinson* v. *Robinson,* 159 Cal. 203 [113 P. 155]; *Pedrow* v. *Federoff,* 77 Cal.App. 164, 172, 173 [247 P. 212]; see *Winning* v. *Board of Dental Examiners,* 114 Cal.App. 658, 670 [300 P. 866].) The jury might have rejected all her testimony had they seen fit, in view of her admitted contradictions, but they were not *bound* to do so. Such "testimony is still evidence in the case which they must receive and weigh. While they may reject it, they may, as they determine, accept as true one of the contradictory

asseverations.'' (8 Cal. Jur. p. 283, § 342; see, also, *In re Vandiveer,* 4 Cal.App. 650, 653 [88 P. 993].) No authority need be cited in support of the proposition that the jury is the sole judge of the credibility of the witnesses and of the weight of the evidence. "Contradictions and inconsistencies in the testimony of a witness alone will not constitute inherent improbability" (*People* v. *Amadio,* 25 Cal.App. 729, 731 [145 P. 151]) and "it is well settled that the general rule governing reviewing courts in dealing with appeals involving a conflict of testimony applies with the same force to cases where the conflict arises from the testimony of one witness as it does to cases where the conflict arises from the testimony of witnesses on opposing sides" (*People* v. *Crownover,* 34 Cal.App.2d 7, 9 [92 P.2d 929], citing cases).

In *People* v. *Avena,* 34 Cal.App. 500 [168 P. 148], the prosecuting witness and her sister both admitted that their testimony at the trial was directly contrary to that given by them at the preliminary examination, and was false. Their explanation of the change was that they had been told that if their father was convicted he would be sent to the penitentiary and they to the detention home or reform school. The court said: "It was for the jury to decide whether these contradictory statements, under all the circumstances and facts placed before the jury, so far impeached these witnesses as to render their testimony at the trial improbable or unbelievable. (*People* v. *Preston,* 19 Cal.App. 685 [127 P. 660].)" Similar cases of admitted self-contradictions with similar holdings are *People* v. *Bond,* 13 Cal.App. 175, 180 [109 P. 150]; *People* v. *Crawford,* 24 Cal. App. 396, 403 [141 P. 824] and *People* v. *Castro,* 85 Cal.App. 228 [259 P. 117]. (See, also, *People* v. *Haydon,* 18 Cal.App. 543, 553, 554 [123 P. 1102, 1114]). In *People* v. *Billings,* 34 Cal.App. 549, 551 [168 P. 396] the court said: ". . . unless the evidence upon which a conviction rests appears to be so radically improbable as to amount to no evidence at all, we are not permitted to examine it merely to determine the preponderance of its probabilities."

All this may be said with equal force with respect to the testimony of the appellant. The jury might have believed his testimony on direct examination that he was in the kitchen when the fire broke out or his testimony on cross-examination that he was in bed with Gertrude Jordan at that time. Or it might have rejected both versions and believed that Gertrude Jordan's first and last version—that he had left her apartment—corroborated as it was by Moore's testimony, and by

Anderson's testimony as to the hallway and can episode, was the truth.

*People* v. *Casillas,* 60 Cal.App.2d 785 [141 P.2d 768], relied on by the appellant is not in point for the reason that there, while there were self-contradictions in the testimony of the prosecutrix there was not, as there is here, any corroborative testimony of *any* version.

Then, too, the jury may have treated as incriminating, the testimony of the witness Grau. He was a pedestrian, a total stranger to the New Amsterdam Hotel and its ground floor occupants and visitors, and the jury may have treated as significant, in considering the time element, his testimony that he saw a heavy-set colored man running, jump into the automobile headed west and drive over the knees of Mamie Pulaski. She had jumped or fallen to escape the fire, and Grau testified that he first saw the fire when he saw the man running out the side door. The jury might have believed that the appellant had left the apartment (and had spent the time in the interval in lighting the fire). On the other hand the jury could have treated the Grau testimony as *corroborative of the appellant's version* that he was in bed with Gertrude Jordan when the fire broke out and concluded that when Grau saw him running out the side doorway he was running directly from her bedroom. It was wholly a jury question.

The testimony of the witness Eisenhauer was along the same line, and corroborative of Grau's testimony with respect to the appellant's driving away after Mamie Pulaski had fallen.

Parenthetically, it might be said in fairness to the appellant that the fact that he ran from a burning building and drove his automobile away from danger is not in itself incriminatory. Such action is consistent with preserving himself from injury and his property from damage. But in the light of all the facts the jury might have taken it against him. It was *their* question. Further, in fairness to the appellant it should be said that the autopsy surgeon testified that the lacerations on Mamie Pulaski's legs might have been caused by the same violent contact with the pavement that caused her skull fracture, and need not necessarily have been caused by being run over. The appellant denied that he ran over the body.

The appellant attacks the testimony of Fire Marshal Kelly on the ground that "it was not based upon the personal knowledge and investigation of the witness, but was totally

speculative and conjectural.'' This testimony (already rather fully summarized) shows, in our opinion, that it was based entirely upon his personal knowledge and upon his own investigation of the ruins after the fire, as his duties required. It was based on the physical facts as he found them; on the course which the fire had taken; on its intensity at certain points; on the fact that the rear stair well had been entirely burned out from the ground floor to and through the roof; on the fact that the fire had burned downward as well as upward. His testimony was in nowise based on that of other witnesses, nor was he asked any hypothetical question. Whatever conclusion is to be drawn from his testimony is no stronger than the physical facts upon which it is based, which facts were all before the jury. In addition to all the testimony in the case, there were numerous photographs in evidence showing the way in which the fire had gutted the interior of the hotel, and in particular how the rear stair well had been entirely burned out. Then, too, the jury viewed the premises and could see for themselves. Four carefully drawn instructions told the jury that they might consider the opinion with the reasons stated therefor, and were not bound to accept the opinion as conclusive, but should give it the weight to which they should find it to be entitled, and might disregard and reject it if found to be an unreasonable one. Further that they might regard it as merely advisory and form their own conclusions from all the evidence.

In his 35 years in the department, with over half that time devoted to the investigation of the origin of fires (a highly specialized occupation) the fire marshal certainly had accumulated a vast store of experience and knowledge which citizens generaly do not possess, and still, the jury was distinctly told that his opinions were not at all conclusive, but could be regarded as ''merely advisory.'' We are satisfied there was no error in the admission of the fire marshal's testimony, particularly in view of the instructions.

The appellant, relying on *People* v. *Simonsen,* 107 Cal. 345 [40 P. 440] ; *People* v. *Vertrees,* 169 Cal. 404 [146 P. 890] ; *People* v. *Saunders,* 13 Cal.App. 743 [110 P. 825] ; *People* v. *Jenkins,* 67 Cal.App. 631 [228 P. 405] and *People* v. *Bispham,* 26 Cal.App.2d 216 [79 P.2d 166], contends that there was no separate and independent evidence tending to establish the corpus delicti.

It is argued that ''no evidence of any kind has been produced to show that it was a set fire.'' It is true that no

witness detected the odor of gasoline or any other such agent. The fire marshal himself found no such evidence, his findings being confined to the physical conditions already discussed, from which he drew certain deductions. Nobody saw the fire started. Anderson's testimony that he saw the appellant with a can (later identified as one of Franklin's containers) although purely circumstantial in character is nevertheless some evidence of incendiary origin. The testimony of several witnesses that they saw liquid on the floor of the hall just outside Gertrude Jordan's apartment, is some evidence, the weight and value of which was solely for the jury. They might have considered it very unconvincing, or the contrary. The fire marshal's testimony tends likewise to prove the corpus delicti. ■ The appellant cites several cases on this subject holding that ''mere proof of the burning of a building alone does not establish the *corpus delicti* of the crime of arson.'' (*People* v. *Roganovich,* 77 Cal.App. 158 [246 P. 132]; *People* v. *Saunders,* 13 Cal.App. 743 [110 P. 825]). This, of course, is settled law. ■ But by the testimony of the witnesses just touched on we are satisfied that the prosecution made independent prima facie proof of the body of the offenses of arson and murder before the introduction of any admissions or other extrajudicial statements and it is well settled that the corpus delicti need not be proved beyond a reasonable doubt (*People* v. *Jones,* 123 Cal. 65 [55 P. 698]; *People* v. *Hatch,* 13 Cal.App. 521, 531 [109 P. 1097]) before such statements are received.

■ The appellant claims that the court committed prejudicial error in refusing to admit the testimony of several witnesses to show that Gertrude Jordan had made contradictory and inconsistent statements, ''thus depriving the defendant of an opportunity to impeach the witness and deprive [ing] the jury of the right to determine the truth or the falsity of the witness.''

After Gertrude Jordan had testified that her testimony before the grand jury to the effect that the appellant had left her apartment before the fire started was the truth, and that her testimony in court to the effect that he was still there was false, Robert Colman, a stepson of the appellant, was called to the stand. A series of questions was put to him to develop the fact that prior to the trial there was an afternoon meeting in an automobile at the corner of Stockton and

Broadway, at which he, his wife, William Leath, Jr. and Gertrude Jordan were present, on which occasion Gertrude Jordan had told those present that she had lied when she testified that George Holman had left her rooms before the fire. The purpose was avowedly impeachment. Objections by the district attorney to these questions on the ground that they were collateral were consistently sustained. The witness was permitted to say that he had a conversation with Gertrude Jordan on that occasion, but when asked what they talked about he was not permitted to answer. This culminated in a tender of proof made in the presence of the jury as follows: ". . . I offer to show by this witness that Gertrude Jordan, in the company of Robert Colman, his wife, and William Leath . . . met in an automobile at Stockton and Broadway; that they conversed for a period of half an hour, and during that conversation Gertrude Jordan told those present that she had lied when she testified that George Holman had left the premises, had left her rooms, before the fire. I further will show that on the fourth of July, that Gertrude Jordan, in company with Robert Colman, came to the office of Attorney Peyser, and there made a voluntary statement, and that during that time, that the statement was given; that it was given in her own language, by herself; and that nobody volunteered or interfered, or told her what to say."

The same tender was repeated while Louella Colman (Robert's wife) and William Leath, Jr. were on the stand, and likewise rejected.

Theresa Sexton, a secretary in the office of appellant's counsel, was questioned respecting a telephone call from Gertrude Jordan to herself on July 14th, three days before the trial, which conversation the witness later reduced to memorandum form from her notes. She was asked to state what Gertrude Jordan had said, whereupon the court asked the purpose and the following colloquy occurred:

"Mr. Peyser: The purpose is to establish the conversation in which she still reaffirmed everything that she said upon this witness stand when she first testified.

"The Court: Well, why repeat it, then?

"Mr. Peyser: So that the jury may know that when this woman testified, that she was still repeating that which she intended to say when she took the witness stand, which was on the 17th, two days following.

"The Court: That is not the proper way to proceed.. Objection sustained."

An offer was then made outside the presence of the jury, to prove the contents of the memorandum of what Gertrude Jordan had said over the telephone. It is very lengthy. Its substance is as follows: It opens with a statement that Gertrude Jordan had come to the end of all the lying; it was getting too involved. Holman did not burn down the building. "She lied, Holman lied, and Hosey Moore lied." The reason for the lying was to keep from Holman's wife, because of the previous trouble, the fact that he had been visiting Gertrude Jordan's apartment. The story had been thought up by Holman while the fire was going on and she and Moore and Holman "were to stick to it and remember it." Then the questioning by the police added to the complexity. "It all got messed up, and if she and Holman and Hosey did not lie, Bubber [Holman] would never be where he is." "She said the story about Holman being there on the couch with her was not true." "This is what happened the night of the fire: They were all there in her rooms, the three of them. It was Holman who first was attracted to the fire. It was he who went to the door. He told them the place was on fire, and that he was going at once to put his car where it would be safe. They sort of shifted for themselves then for awhile. He returned, and after getting her things out as much as they could, then they got together and hatched the story." The memorandum concludes as follows: "She says Johnny was paid to say he saw Holman with the can in his hand. That Johnny was the only one she was afraid, because she knew he would tell any kind of a lie for a very small sum of money. She would never have anything to do with him, because he did not work, and she is afraid of any man who does not work. She said there is no doubt about it that Johnny was paid for his part in it." After the tender the prosecution made the further objection that no foundation had been laid. The court rejected the offer of proof.

The respondent answers this attack by showing that no foundation had been laid for the introduction of any of this evidence, by first interrogating Gertrude Jordan as required by section 2052, Code of Civil Procedure as to whether or not she had made the claimed contradictory statements. And a careful examination of the record shows that she was not

asked whether she had made the statements as to which the defense was later to put in contradictory evidence. In *People v. Foster,* 117 Cal.App. 439, 445 [4 P.2d 173], the approved method of impeachment is said to be to *first ask the witness sought to be impeached if she had not made such and such a contrary statement on another specified occasion* and if she answered "no," then to read into the record such other statement. The court then says: "That this method might require several questions as to whether the witness had testified in a certain manner and a number of answers does not obviate the necessity of calling the witness' attention to the testimony given in answers to questions at the preliminary examination or justify the blanket procedure adopted by appellant in this case." See, also, as to the proper method of examination: *People v. Nonella,* 99 Cal. 333 [33 P. 1097]; *McLaughlin v. Los Angeles Ry. Corp.,* 180 Cal. 527, 539 [182 P. 44]; *Barsotti v. Imperatrice,* 97 Cal.App. 569, 575 [275 P. 892]; 10 So. Cal. Law Rev. 137-165. In *Rignell v. Font,* 90 Cal.App. 730, 737 [266 P. 588], this court said, "It would be eminently unfair to a witness to seek to impeach him without calling his attention to the specific statements which it is claimed he has fabricated, and giving him an opportunity to explain or correct the alleged discrepancy. This is absolutely necessary before one may impeach either his own or an adverse witness (citing cases)."

In *People v. Singh,* 182 Cal. 457, 481 [188 P. 987], the court says: "Considered as independent evidence, the statements were clearly hearsay and, as such, incompetent and inadmissible," and at page 482: "Apart from the lack of foundation testimony, the question put to the impeaching witness called for the entire conversation, and under no theory whatever was the defense entitled to more than the variant statements." In the case at bar, Robert Colman was asked just before the tender, "What did Gertrude Jordan say to you, and what did you say to her?" and in the Singh case the objectionable question was "Will you state to the jury what your questions were and what answers were made by her....?"

▉ Neither the July 4th statement (which was received into evidence, and of which the appellant cannot complain) nor the Stockton and Broadway conversation nor the telephone conversation of July 17th, was admissible as original or independent evidence, such as an admission (as was the case in *People v. Sprado,* 72 Cal.App. 582, 593 [237 P. 1087];

*People* v. *Ferrara,* 31 Cal.App. 1, 5 [159 P. 621] ; *People* v. *Morley,* 89 Cal.App. 451, 460, 461 [265 P. 276] ; *People* v. *Barr,* 134 Cal.App. 383, 387 [25 P.2d 503]) for the reason that they were the statements of a mere witness who was not a defendant. As we have seen, as independent evidence they were hearsay (*People* v. *Singh, supra*). Moreover, each of them, if admitted, would have followed the "blanket procedure" condemned in *People* v. *Foster, supra,* and would have placed before the jury, as an examination of the tenders will show, a mass of "irrelevant and incompetent matter" (see *People* v. *Nonella, supra,* p. 335).

The methods prescribed in the code for the impeachment of a witness are exclusive. (*People* v. *Harlan,* 133 Cal. 16, 20 [65 P. 9] ; *Estate of Gird,* 157 Cal. 534, 547 [108 P. 499, 137 Am.St.Rep. 131] ; *People* v. *Sprado,* 72 Cal.App. 582, 600, *supra.*)

The rule is not peculiar to this state. It has been the law generally in most English speaking jurisdictions since the early 1800's (see §§ 1025-1029, 3 Wigmore on Evidence, 3d ed.) Wigmore says (§ 1028), "In all but a few jurisdictions the rule is recognized, and is enforced as an inflexible one. . . ."

The admission of this proffered testimony of Robert and Louella Colman, William Leath and Theresa Sexton, would have been in direct violation of this rule and therefore the court's rejection of it was proper.

The appellant claims that under the holding in *People* v. *Campos,* 10 Cal.App.2d 310, 317 [52 P.2d 251], it was not necessary to first confront Gertrude Jordan with her claimed inconsistent statements "with the circumstances of times, places and persons present," but an examination of that case shows it is not in point. The text in 27 California Jurisprudence page 159, section 133, upon which the court relies in the Campos case explains the distinction. It reads: "Although a proper foundation must be laid before inconsistent statements may be proved by the testimony of other witnesses, yet, for the purpose of discrediting a witness by his own admissions, it is proper, upon cross-examination, to question him as to prior inconsistent statements, without calling attention to the time, place, circumstances and persons present . . ." (citing numerous cases). It will be seen at a glance that what was being attempted in the case at bar was not an examination such as that sanctioned in the Campos case.

The case of *People* v. *Brazil*, 53 Cal.App.2d 596 [128 P.2d 204], cited by appellant, in so many words holds the questions asked Mrs. Brazil to be proper *"for the purpose of laying a foundation for the impeachment of the witness"* pursuant to section 2052. (Italics added.) In *People* v. *Crow*, 48 Cal.App.2d 666 [120 P.2d 686] cited by appellant the opinion does not show how the question arose. It was apparently a situation similar to that in the Campos case, *supra.* And in *People* v. *Pollock*, 31 Cal.App.2d 747 [89 P.2d 128], cited by appellant, just as in the Brazil case, the court said that the question was proper *"in laying the foundation for impeachment of Mrs. Pollock."* The Brazil and Pollock cases do not militate against the rule just discussed; they support it.

 The appellant makes a strong attack on the testimony of Anderson and other witnesses, based on inherent improbability. Counsel argues that Anderson could not have told the truth about the appellant coming down the burning stairway just ahead of the flames for the reason—argued and analyzed at considerable length—that the appellant could not have done this without being caught in the fire. Other similar arguments with respect to physical facts are contained in the briefs, but (to quote from *Bechtold* v. *Bishop & Co.*, 16 Cal.2d 285 at 291 [105 P. 984]). "Appellants' argument is one which might be persuasive if addressed to a trial court. Addressed to an appellate court, it fails to carry conviction. In this state the credibility of a witness and the weight to be accorded to his testimony are questions directed to the trial judge . . ." (citing cases). On this subject, what is said in *People* v. *Bolton*, 215 Cal. 12, 15 [8 P.2d 116], is particularly apt: " 'It is strenuously insisted by appellant that the evidence adduced before the jury was insufficient to warrant their verdict or to support the judgment. Much of the evidence of witnesses called by the prosecution is criticized as improbable, unworthy of belief, or otherwise of questionable weight, but with these questions the trial court and jury were vested with conclusive jurisdiction except where their implied findings can be said to be unsupported by substantial evidence, regardless of evidence contrary to such findings. (*People* v. *Dant*, 68 Cal.App. 588 [229 P. 983].)' "

 The appellant's contention that "circumstances relied upon to establish the guilt of one accused of crime must be consistent with that hypothesis and inconsistent with any other rational conclusion" cannot of course be gainsaid, and the

jury in this case was given an instruction substantially to that effect. The testimony of Anderson that he saw the appellant with a can in his hands running from the fire; that of Gertrude Jordan and of Moore that they noticed some liquid on the floor outside her apartment, although neither detected the odor of gasoline; that of Franklin that he had sold 5 gallons of gasoline to the appellant only two days before the fire, and the finding of the can on appellant's premises; that of Moore and Anderson that they heard threats made by the appellant not more than 30 minutes before the fire was discovered, and that of Gertrude Jordan that he had threatened her life some time before the fire—all this evidence was consistent with guilt and inconsistent with innocence. The testimony of Gertrude Jordan that the appellant had admitted to her that he had burned the building could not possibly be consistent with innocence.

It was clearly pointed out in *People* v. *Newland,* 15 Cal.2d 678, 682 [104 P.2d 778], quoting from *People* v. *Perkins,* 8 Cal.2d 502, 519 [66 P.2d 631] that ''the rule that the circumstances relied upon by the prosecution must be consistent with guilt and inconsistent with an hypothesis of innocence is a rule of instruction for the jury, and is not the rule for the guidance of the court on review. It [the Supreme Court in the Perkins case] said: 'The rule above announced does no more than to instruct the jury that, if a reasonable doubt is created in their minds for any reason, they must acquit the defendant. But, where the jury rejects the hypothesis pointing to innocence by its verdict, and there is evidence to support the implied finding of guilt as the more reasonable of the two hypothesis, this Court is bound by the finding of the jury'.''

We are satisfied that the appellant's complaint is not well founded that four tendered instructions were refused. They dealt with the burden of proving the *corpus delicti* in an arson case. Appellant cites no supporting authorities on this point. The instructions which were given fully and fairly covered this phase of the case. The jury were repeatedly instructed on reasonable doubt, and although (as appellant complains) they were not told in so many words that mere proof of the burning of a building does not establish the *corpus delicti* of the crime of arson, that crime was defined to them and they were told that ''As applied to a particular offense, *corpus delicti* means the actual commission *by someone* of the particular crime charged.'' (Emphasis added.) When read in connection with all the instructions the jury could not

fail to understand that the instructions meant that they must be convinced that the defendant on trial was the person who set fire to, or burned, or caused to be burned the building in question as defined in the section on arson, which was read to them.

In pronouncing sentence the court ordered and adjudged that the defendant ''be punished by imprisonment in the State Prison of the State of California at San Quentin, for the term of life, on each of the twenty-two counts, said twenty-two counts to run consecutively.''

The appellant points out that the court could have' rendered a judgment of life imprisonment only, and that that part of it to the effect that the sentences were to run consecutively was mere surplusage.

The respondent claims that such sentence was permissible under the authority of *In re Quinn*, 25 Cal.2d 799 [154 P.2d 875], but that case is not in point for it did not involve one or more sentences *expressly prescribed* by law to be for life, but several indeterminate sentences with a maximum of life and a minimum of a term of years. In holding that such sentences might be imposed to run consecutively, the court expressly pointed out at page 804 that: ''it is obvious that the punishment is not as to any of the counts *expressly prescribed* to be life imprisonment. Hence the quoted amendment [to Pen. Code, § 669] has no application to the present case in any event.'' Section 190, Penal Code prescribes that ''Every person guilty of murder in the first degree shall suffer death, or confinement in the state prison for life, at the discretion of the jury . . .'' and in our opinion such express provision brings this situation squarely within the proviso of section 669, Penal Code (as amended in 1943) that ''if the punishment for any of said crimes is *expressly prescribed* to be life imprisonment, whether with or without possibility of parole, then the terms of imprisonment on the other convictions, whether prior or subsequent, shall be merged and run concurrently with such life term.'' (Emphasis added.) Accordingly, we agree with the appellant's contention on this point. The surplusage did not, however, constitute reversible error. It may be corrected by the resentencing of the appellant (the procedure indicated in *People* v. *Bender,* 27 Cal.2d 164, 186, 187 [163 P.2d 8].

Finally, it is claimed that the verdicts were not first recorded and thereafter read to the jury as recorded, and inquiry then made whether the verdicts as recorded were their

verdicts. The clerk's certified record on appeal shows the following proceedings immediately after the jury returned from the jury room:

"Thereupon the Court asked the Jury if they had agreed upon a verdict. The Foreman of the Jury replied 'We have,' and thereupon presented to the Court the written verdicts of the Jury. Thereupon the Clerk read the verdicts to the Jury and the Jury declared the same to be their verdicts. Thereupon by order of Court, the Clerk recorded the verdicts in the minutes of the Court and read the same to the Jury as they appear of record, to-wit:" [here follow, in the clerk's transcript, the 22 separate verdicts]. We are satisfied that the case of *People* v. *Sing Chan,* 64 Cal.App.2d 167, 173, 174 [148 P.2d 81] answers this point.

The judgment is modified so as to eliminate and strike from the sentence as heretofore pronounced and imposed the words "said twenty-two counts to run consecutively," and as so modified is affirmed. The cause is remanded to the trial court with directions to pronounce judgment on the defendant on each of the twenty-two counts sentencing him to imprisonment in the state prison for the term prescribed by law for murder of the first degree, to wit, for the life of said defendant.

Nourse, P. J., and Dooling, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied January 3, 1946.